PROVOSTY, C. J.
The defendant gas-company furnishes natural gas to the city of Shreveport and neighboring towns under contracts heretofore entered into with them wherein the rates at which the gas is to be furnished are fixed.
Deeming the rates inadequate, the defendant ' company applied to the Public Service Commission of the state for an increase; and same having been granted, the present suit followed, in which the plaintiff, city of Shreveport, asks that the Commission be enjoined from exercising jurisdiction in the premises, and the said gas company from collecting the said increased rates. The ground of the suit is that the jurisdiction, or power, in the matter of fixing gas rates for the city belongs to the city, and not to the Commission.
[1] For clearness in exposition it may be well to premise that this rate-making power,, which primarily belongs to the state Legislature as inherent in the sovereignty of the state, may be variously delegated to the municipalities. It may result to them from *867 the authority they ordinarily possess to regulate the use of the streets and provide for the welfare of the inhabitants. In that phase of its exercise the rates are fixed by contract, subject to the right of the Legislature to change them whenever the public interest may require. The contract in its rate-fixing feature is then binding on the city, but not on the Legislature. With such a contract this court had to deal in the case of Shreveport Traction Co. v. City of Shreveport, 122 La. 1, 47 South. 40, 129 Am. St. Rep. 345. Another phase of the delegation of the power is that with which the Supreme Court of the United States had to deal in the cases of Vicksburg v. Vicksburg Waterworks Co., 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155, and Detroit v. Detroit Citizens’ Street R. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, which cases, in the language of that court, “settled * * * that the state may authorize one of its municipal corporations to establish by an inviolable contract the rates to be charged by a public service corporation * * * for a definite term, not grossly unreasonable in point of time, and that the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates.” Home Telegraph Co. v. Los Angeles, 211 U. S. 265-273, 29 Sup. Ct. 50, 52, 53 L. Ed. 176-182.
Such a contract, we may mention in passing, would not be possible in this state in view of the constitutional provision forbidding the abridgement of the police power.
Finally, another phase is where this governmental power of fixing rates is delegated to a city in the manner and form as we now find it conferred by our Constitution adopted in 1921 upon the Public Service Commission in section 4 of article 6, to wit:
“Sec. 4. The Commission shall have and exercise !uj necessary power and authority to supervise, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other-water craft, sleeping car, express, telephone, telegraph, gas, electric light, heat and power, waterworks, common carrier pipe lines, canals (except irrigation canals) and other public utilities in the state of Louisiana, and to fix reasonable and just single and joint line rates, fares, tolls or charges for the commodities furnished, or services rendered by such common carriers or public ' utilities, except as herein otherwise provided.
“The power, authority, and duties of the Commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities hereby, or which may hereafter be made subject to supervision, regulation and control by the Commission. The right of the Legislature to place other public utilities under the control of and confer other powers upon the Louisiana Public Service Commission respecting common carriers and public utilities is hereby declared to be unlimited by any provision of this Constitution.
“The said Commission shall have power to adopt and enforce such reasonable rules, regulations, and modes of procedure as it may deem proper for the discharge of its duties, and it may summon and compel the attendance of •witnesses, swear witnesses, compel the production of books and papers, take testimony under commission, and punish for contempt as fully as is provided by law for the district courts.”
The rate-fixing power as here conferred is exercised irrespective altogether of the consent of the public utility company — the new rate is imposed by compulsion. The distinction between the power in this phase of it and in the first hereinabove mentioned phase was considered by the Supreme Court of Oregon, in the light of the authorities, in the case of Woodburn v. Public Service Commission, 82 Or. 127, 161 Pac. 395, L. R. A. 1917C, 105, Ann. Cas. 1917E, 1000, and the conclusion lucidly stated as follows:
“The right of the state to regulate rate by compulsion is a police power, and must not be confused with the right of a city to exercise its contractual power to agree with a public service company upon the terms of a franchise. The-exercise of a power to fix rates by agreement does not include or embrace any portion of the power to fix rates by compulsion. When Woodburn granted the franchise to the tele *869 phone company, the city exercised its municipal right to contract, and it may be assumed that the franchise was valid and binding upon both parties until such time as the state chose to speak; but the city entered into the contract subject to the reserved right of the state to employ its police power and compel a change of rates, and when the state did speak, the municipal power gave way to the sovereign power of the state.”
See, in the same sense, City of Scranton v. Public Service Com., 268 Pa. 192, 110 Atl. 775.
The question in the present case is not as to whether the city has not had heretofore the power to fix a gas rate by agreement with the gas company, or might not do so now; but it is as to whether it has thus had, and now has, the power to impose a gas rate by compulsion.
[2] If the city had this power at the date of the adoption of the said constitutional provision she still has it; for, as recently held by this court in the case of State v. City of New Orleans, No. 25074, ante, p. 24, 91 South. 533, the rate-making powers possessed by the cities at the date of the adoption of the Constitution of 1921 are reserved to them by section 7 of said article 6, reading:
“Sec. 7. Nothing in this article shall affect the powers of supervision, regulation and control over any street railway, gas, electric light, heat, power, water works, or other local public utility, now vested in any town, city, or parish government unless and until at an election to be held pursuant to laws to be hereafter passed by the Legislature, a majority of the qualified electors of such town, city, or parish, voting thereon, shall vote to surrender such powers. In the event of such surrender such powers shall immediately vest in the Louisiana Public Service Commission; provided, that where any town, city, or parish shall have surrendered as above provided, any of its powers of supervision, regulation and control respecting public utilities, it may in the same manner, by a like vote, reinvest itself with such powers.”
[3] In reading the city charter for ascertaining whether it confers this power we are to bear in mind that grants of power to a city beyond those necessary for its properly functioning as a municipality are construed strictly, and that any reasonable doubt is resolved against the corporation. 28 Cyc. 265.
“The Legislature of a state, merely by establishing a municipal corporation, does not delegate to such corporation the right to exercise all the governmental powers of the state within its territorial limits, or even such powers as are commonly exercised by a municipal corporation of the same class. It is well settled that a municipal corporation has only such powers as are clearly and unmistakably granted to it by its charter or by other acts of the Legislature, and consequently can exercise no powers not expressly granted to it, except those which are necessarily implied or incident to the powers expressly granted and those which are indispensable to the declared objects and purposes of the corporation. Any fair and reasonable doubt concerning the existence of the power, or any ambiguity in the statute upon which the assertion of the power rests, is to be resolved against the corporation and the power denied.” 19 R. C. L. 768.
[4] Indeed, this power compulsorily to impose rates being a high attribute of sovereignty, not particularly needed by municipalities for properly functioning, and not usually delegated to them, its delegation could not well be held to have resulted unless from such terms as were positive or absolutely unmistakable.
[5] The delegation in the present case is to be found, if at all, in the italicized parts of the following, which is. section 11 of Act 158 of 1898, under which the city is organized, to wit;
“To regulate and malee improvements to the streets, alleys, public squares, wharves and other public property, and to provide for the lighting and watering of the same, to provide grounds and facilities for any of its departments, and to order and direct the ditching, filling, opening, widening and continuing of any streets or alleys; and if, for such purposes the land of any person or body corporate is necessary to be had, the said city council shall have the right and power of purchasing the same at a reasonable price, or cause the same to be expi-opriated according to the manner and formalities prescribed by existing laws on the subject the said council shall have the power to acquire amicably *871 or by expropriation proceedings, electric light or gas or waterworks or sewerage pla/nts, or to provide for the construction and operation of proper facilities for lighting and furnishing waiter and sewerage to the city and citizens, same to be owned by the city of Blvreveport.
“To regulate the proportion and to make and repair all common sewers, drains, canals, public roads, levees, dykes, causeways and bridges, notwithstanding any superintendence which might be set up by any corporation or individual over such work. To determine the completion and dimensions of the pavements of the streets, to fix the squaring, and to prevent any encroachment upon or stopping and obstructing the streets, alleys, public squares, levees, public roads, or any part of the landing or port of Shreveport, and to order any object, whatever may be its value which may incumber said places, or prevent and embarass the free use of same, to be torn down and removed, or sold for whom it may concern, in the same manner and after such notices as shall be required by such regulations.”
The power to fix rates by compulsion is clqarly not granted here — let alone granted in unmistakable terms. So plain is this, that anything further need hardly to be said. Still, so apposite is the following extract from the opinion of the Supreme Court of the United States in the ease of City of Winchester v. Winchester Waterworks Co., 251 U. S. 192, 40 Sup. Ct. 123, 64 L. Ed. 221, that we will reproduce it here:
“ * * * That a city has no power to regulate rates of this character unless it has legislative authority so to do is established, and does not seem to be disputed by the appellants, ‘independently of a right to regulate and control the rates to be charged for public service reserved in a grant of a franchise or right to use the city streets; a city or other municipality has no power to regulate the rates to be charged by water, lighting, or other public service corporations in the absence of express or plain legislative authority to do so.’ 3 Dillon on Municipal Corporations (5th Ed.) § 1325. Nor does such authority arise from the power to regulate the opening and use of streets, nor a grant of the general right to control and regulate the right to erect works and lay pipes in the streets of the city. State v. Missouri & K. Telephone Co., 189 Mo. 83; Jacksonville v. Southern Bell Tel. Co., 57 Fla. 374; Lewisville Natural Gas Co. v. State, 135 Ind. 49; Mills v. Chicago, 127 Fed. Rep. 731; State v. Sheboygan, 111 Wis. 23.
“Bearing this * * * principle in mind, we come to examine the sections of the laws of Kentucky which, it is insisted, give the authority to fix water rates. .The appellants insist that this power is expressly conferred in subsection 25 of section 3490 of the Kentucky Statutes, which reads as follows: ‘The board of council may grant the right of way over the public streets or public grounds of the city to any railroad company or street railroad company, on such conditions as to them may seem proper, and shall have a supervising control over the use of same, and shall regulate the speed of cars and signals and fare on street cars; and under like condition and supervision may grant the right of way that may be necessary to gas companies, water companies, electric light companies, telephone companies, or any like companies; and may compel any railroad company to erect and maintain gates at any or all street crossings, and to prevent railways from blocking or obstructing the streets or public ways of the city, and to fix penalties for the violation of these provisions.’ * * *
“Examining subsection 25, we are unable to discover any grant of authority to fix rates for water consumption. It is therein first provided that the council may grant the right of way over the public streets to any railroad or street railroad company on such conditions as to the council may seem proper, and shall have a supervising control over the use of the same, and the council is given the right to regulate the speed of cars and signals and fare on street cars, and under like conditions and supervision, the council may grant the right of way to water companies among others. This language is certainly very far from that express authority to regulate rates, which is essential in order to enable municipalities so to do. The power to grant a right of way to water companies is specifically granted, and this under like conditions and supervision already provided as to railroad and street railroad companies. This is the full measure of the grant of authority to deal with water companies. The right to regulate fares is in the same sentence which grants authority to deal with water companies, and is specifically limited to fares on street cars. * * *
“This language was used in regard to the authority given in express terms to fix rates. It was said of such authority that it was but the endowment of a common governmental power. This is undoubtedly true. But it is equally certain that the governmental power rests with the state, and must be conferred upon the municipality in an unmistakable way.”
*873 Subsequently to its organization under said Act 158 o£ 1898 the city of Shreveport adopted the Commission form of government provided for by Act 302 of 1910. Thereby, however, no additional powers were acquired by her; but, by the express terms of said act, sections 4 and 17, her powers remained the same as theretofore, the fourth section reading:
“Be it * * * enacted, etc., that the council shall have and possess, and the council and its members shall exercise all executive, legislative, judicial and administrative powers, duties and functions now had, possessed and exercised by the municipal authorities, and officers elected or appointed under the authority of the several charters of the cities as organized prior to the adoption of the provisions of this act by any city, unless otherwise provided in this act.”
[6] Again, thereafter, by Act 220 of 1912, the charter of the city was amended, assuming, for the purposes of this case, that the said Act 220 is constitutional. The pertinent part of said Act 220 reads, that the city shall have power—
“to appoint an inspector of gas meters and gas, and to fix the quality of gas furnished in the city, both in regard to its lighting and heating power; to fix a uniform pressure of gas, and to establish a standard of gas to be sold within the city, and to regulate as far as may be necessary in the interest of the public, the delivery of said gas to the consumers thereof.”
Of this provision the same may be said as of the provision of Act 158 of 1898, that it clearly does not confer the compulsory power to fix rates, or, in other words, to change rates as the public interest may require.
[7] In connection with the said section 4 of Act 302 of 1910, it is contended that the words “by any city” found in said section qualify the words “had, possessed, and. exercised,” and not the word “adoption,” so as to. read, “had, possessed, and exercised by any city,” and that, as an effect of this, the city of Shreveport and every other city of the state adopting said Act 302- enjoys all the powers possessed by the city of New Orleans or by any other city in the state. But evidently the verb qualified by said adverbial phrase is the verbal noun “adoption” — “the adoption of the provisions of the act by any city.” The idea that the Legislature intended to confer upon any city adopting this commission form of government the extraordinary powers possessed by the city of New Orleans, and whatever other powers may be possessed by every other city of the state, and not only the powers presently thus possessed, but all powers which may at any time be extended to any city in the state, is, needless to say, not to be entertained.
The judgment appealed from, which denies the contention of the city of Shreveport and refuses the injunction herein prayed for, is affirmed, at the cost of the city of Shreveport.
Rehearing refused by Division B, composed of Justices O’NIELL, LAND, and BAKER,