(100 South. 710)

No. 26147.

### BATON ROUGE WATERWORKS CO. v. LOUISIANA PUBLIC SERVICE COMMISSION.

(March 8, 1924. Rehearing Denied by Whole Court June 7, 1924.)

*(Syllabus by Editorial Staff.)*.

**1. Public service commissions** ☞7—**Rate-making power within police power of state.**

Rate-making power, whether exercised by agreement or by fiat of law, is within police power of state as one of state's highest attributes of sovereignty, and this power can never be abridged nor irrevocably surrendered where there is a constitutional inhibition.

**2. Constitutional law** ☞63(1)—**Public service commissions** ☞7—**State may delegate to municipal corporation or commission rate-making powers.**

A state may either expressly or by reasonable implication delegate to a municipal corporation, or to some subordinate board or commission, lawful exercise of police .power for rate-making purposes within boundaries of such municipality, board, or commission.

**3. Public service commissions** ☞7—**Power to make rates to govern local utilities placed by law under control of municipality, excluded from Public Service Commission.**

Under Const. 1921, art. 6, §§ 4, 7, it was. intention to except and exclude from Public Service Commission power to make rates to govern local public service utilities which theretofore had been placed under power, supervision, and control of town, city, or parish government.

**4. Waters and water courses** ☞203(6)—**City of Baton Rouge held authorized to establish rates to exclusion of Public Service Commission.**

City of Baton Rouge under its charter was vested with authority at time of adoption of Const. 1921, art. 6, §§ 4, 7, to supervise, regulate, and control waterworks therein, and to establish rates and charges, and such power is. therefore withheld from Public Service Commission.

**5. Waters and water courses** ☞203(6)—**Municipality prior to Constitution had implied. power to fix rates.**

At least up to Const. 1921, art. 6, §§ 4, 7, a municipal corporation had implied power to supervise waterworks system and to enter into contracts to supply inhabitants with water, and fix rates in such contract, and no express. grant of power was necessary.

**6. Evidence** ☞25(2)—**Common knowledge that all municipalities were exercising power of regulation over waterworks systems.**

It was common knowledge that prior to Const. 1921, art. 6, §§ 4, 7, all municipalities. having waterworks system exercised power of supervision, control, and regulation, and were. making contracts and fixing rates therein.

**7. Municipal corporations** ☞271—**Authority to provide water supply.**

Authority to a city to provide an adequate. water supply includes power to do and perform everything incident thereto and necessary to. attain that object.

8. Waters and water courses ⬿203(6)—Municipality authorized to fix rates by compulsion.

Power granted to city to fix water rates without reservation or restriction carries with it right to fix rates by compulsion as well as by contract.

Overton and Land, JJ., dissenting.

Appeal from Twenty-Second Judicial District Court, Parish of East Baton Rouge; W. W. Bailey, Judge.

Action by the Baton Rouge Waterworks Company against the Louisiana Public Service Commission. Judgment for defendant, and plaintiff appeals. Reversed and remanded, with directions.

Laycock, Borron & Laycock and Taylor & Porter, all of Baton Rouge, and Monroe & Lemann, of New Orleans, for appellant.

Huey P. Long, of Shreveport, and W. M. Barrow, of Baton Rouge, for appellee.

By the WHOLE COURT.

THOMPSON. J. This is a controversy between two state agencies—one statewide, the other purely local—each functioning under delegated powers. The dispute is over the right to govern and control a local public service utility and to establish and enforce rates for the services rendered by such utility.

Shorn of all immaterial and lateral considerations, the primary question presented is whether the city of Baton Rouge, under its legislative charter, was vested with the authority at the time of the adoption of the Constitution of 1921 to supervise, regulate and control the waterworks system owned and operated by the Baton Rouge Waterworks Company, and to establish rates and charges for water supplied and sold to consumers within the city by the said company. If the city had such power, it is conceded that the authority still exists, and was not withdrawn nor vested in the Public Service Commission by the Constitution.

More than 30 years ago the city of Baton Rouge entered into a commutative contract with the assignors of the present waterworks company by which a water supply for said city and its inhabitants was secured. The time limit, as provided in the contract, was 30 years from its date. The city expressly reserved the privilege of purchasing the waterworks at any time after 20 years from November 9, 1887.

About 1910 a litigation arose between the city and the waterworks company, in which the city sought to rescind the contract, but a compromise was effected, the terms of which were merged into a judgment of the federal court. In this compromise agreement, as well as in the original contract, the water rates suggested and fixed by the city of Baton Rouge were accepted by the waterworks company. At the time of the compromise the right of the city to purchase the water plant had accrued, but, the city being financially unable to purchase the same, and in consideration of the large amount of capital required to be expended by the water company to enlarge and extend the plant to meet the necessities of the city and its inhabitants, the term of the option to purchase was postponed to a future date.

In consideration of the right granted the waterworks company to construct, maintain, and operate a waterworks system at certain rates fixed and agreed on, it was stipulated that the company should furnish free water up to a maximum stated allowance during the existence of the contract, for each public school established or to be established, for each market house, for the city hall and jail, for four automatic float-valve drinking fountains, for one Catholic orphan asylum, for one Protestant orphan asylum, and for street sprinkling.

We have stated the conditions of the contract somewhat in detail to show that there were mutual obligations and undertakings

of no less vital importance and concern to the city and its inhabitants than the making of water rates.

In the judgment of the Circuit Court of the United States, it was declared that the contract entered into between the city and the waterworks company was a valid and binding contract to the extent and for the purposes set forth, and that the city of Baton Rouge had no right to annul the same.

The terms of the contract and the water rates and charges as fixed therein appear to have been entirely satisfactory both to the city and to the company, and there is no present demand on the part of either the waterworks company, the city of Baton Rouge, or the state to have said contract annulled and rescinded, except in so far as the Public Service Commission may be said to act for the state in its asserted authority and jurisdiction to supervise and control the water company.

In April of the present year the Public Service Commission, assuming authority under the Constitution of 1921, on its own initiative, ordered the Baton Rouge Waterworks Company to show cause why the rates as fixed by the contract between said company and the city of Baton Rouge should not be lowered, and for the further purpose of aiding and assisting the Commission in prescribing all reasonable rules, rates, and regulations which may appear proper and necessary in connection with the furnishing and supplying of water to any and all consumers.

The company appeared and excepted to the jurisdiction and power of the Commission to interfere with said company in its contractual relations with the city of Baton Rouge, and challenged the authority of said Commission to supervise, regulate, and control said company, or fix the rates for water furnished the city and its inhabitants. The exception was overruled, whereupon the present proceeding was filed for an injunction against the Commission. On a rule nisi the injunction was denied and the application was dismissed. The plaintiff brings this appeal.

### Opinion.

[1, 2] It is conceded on well-recognized authority that the rate-making power, whether exercised by agreement or by the fiat of law, is within the police power of the state as one of the state's highest attributes of sovereignty, and that this power can never be abridged nor irrevocably surrendered where there is, as in this state, constitutional inhibition. But equally well settled is the doctrine that the sovereign may, either expressly or by reasonable implication, delegate to a municipal corporation or to some subordinate board or commission, the lawful exercise of the police power within the boundaries of such municipality, board, or commission.

Section 4, art. 6, of the Constitution of 1921, provides that the Public Service Commission shall have and exercise all necessary power and authority to supervise, govern, regulate, and control all waterworks and other public utilities, and to fix reasonable and just rates, fares, tolls, or charges for the services rendered by such public utilities, except as otherwise provided in the Constitution. The proviso or exception is to be found in section 7 of the same article 6; and it declares that nothing in this article shall affect the powers of supervision, regulation, and control over any waterworks or other local public utility now vested in any town, city, or parish government, unless and until, at an election to be held, a majority of the qualified electors in such town, city, or parish voting thereon shall vote to surrender such powers.

[3] It is to be observed that the last above mentioned section makes no reference to the power to make rates and charges. It is obvious, however, from the language used when

taken in connection with section 4, that it was the intention and purpose of the framers of the Constitution to except and to exclude from the Public Service Commission the power to make rates to govern those local public service utilities which theretofore had been placed by law under the power, supervision, and control of the town, city, or parish government.

In other words, it could not have been intended to allow the municipalities to retain control, supervision, and regulation of their public utilities, and to withhold from them the power to make rates, and to place that authority in the Public Service Commission. This was the construction placed on the qualifying section or proviso in the case of State v. City of New Orleans, 151 La. 24, 91 South. 537, wherein we said:

"But our opinion is that the reservation of 'the powers of supervision, regulation and control' was intended to include, and does include, the authority to fix rates."

And quoting further from said case, referring particularly to the language of section 6 in regard to the local utilities which may thereafter be placed under the control of the Commission, we said:

"The language is a recognition that there are public utilities * * * that are not 'under the control of the Commission;' and it is an acknowledgment that those public utilities that are not 'under the control of the Commission' are not subject to the authority of the Commission to fix rates. * * *

"We do not find any indication in the provisions of the new Constitution referring to public utilities, * * * of an intention to divide the authority over local public utilities—to give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making authority over a local public utility. There is no reason why such authority should ever be—and an obvious reason why it should never be—so divided; for a division of it would only result in confusion, conflict of authority, and deadlocks."

156 LA.—18

We can see no sufficient reason in this case to recede from the conclusion reached in the cited case and so aptly expressed in the opinion of the present Chief Justice, and which was concurred in by the entire court of nine as then constituted. So that the question of the power of a municipality which was vested with the authority of supervision, regulation, and control of its local public service utilities at the time of the adoption of the present Constitution, to make rates and charges to govern such utilities, may be regarded as set at rest until such time as that power is surrendered by the municipality as indicated in the Constitution, or is withdrawn in the same manner and by the same token by which the power was conferred, unless the case supra is overruled.

[4] We must therefore look to the charter of the city of Baton Rouge to ascertain whether the city possessed the power to supervise, regulate, and control the waterworks system at the time of the adoption of the Constitution. The charter (Act 169 of 1898) provides that the city shall be vested with all the powers, rights, and immunities incident to a municipal corporation and necessary to the proper government of the same; that the council shall have power to enact all laws and ordinances necessary for the general welfare of said corporation and the inhabitants thereof; and to this end the council is specially empowered to pass ordinances to provide an adequate water supply; to authorize the use of the streets for water pipes and sewers and to regulate the same and to exercise general police powers.

19 Ruling Case Law, p. 789, says:

"* * * That it was considered at one time that the power to provide a public water supply was one of the necessary and incidental powers of a municipal corporation, but the later and sounder view is, that this power is not a necessary incident of a municipal charter but must be derived directly from the Legislature."

But the later and sounder view has not obtained in this state, as we will endeavor to show. In the case of Conery, Jr. et al. v. Waterworks Co. et al., 41 La. Ann. 922, 7 South. 8, an attempt was made to have the existing contract for the supply of water to the corporation delared a nullity for the alleged reason that the city of New Orleans had no authority to make the contract, and that the contract was ultra vires, illegal, and unconstitutional. The question propounded was: Did the city in making the contract exceed any limitation placed upon her in the exercise of her police powers? The court in answering the question said:

"Her charter is silent as to any restriction. In it there is no regulation of any price as to the water to be supplied, nor is there any restriction as to the quantity or the character of the water. * * *

"In the instant case the city of New Orleans had full power to contract, without restraint as to price, quantity or kind of water, and we are not disposed to question the administrative discretion vested in the city in this respect. * * *

"We are of the opinion that, independent of any statutory provision subsequently enacted authorizing the city to contract for her water supply, that she had full and plenary power to do so under the provisions of her charter."

And the court further said on page 922 (7 South. 12):

"The city of New Orleans by virtue of her inherent police powers then had a right to contract with reference to a water supply for the public health, and to extinguish fires. And having the right and having made the contract, her responsibility is to be measured like that of an individual or any civil or business corporation."

In New Orleans Gaslight Co. v. City of New Orleans et al., 42 La. Ann. 188, 7 South. 559 the suit was to annul the contract made between the city and the Louisiana Electric Light & Power Company, and one of the grounds was that the city had no power in law to enter into such a contract. The court said:

"The rule as established by jurisprudence seems to be that, in the absence of special legislative prohibition or restriction, a municipal corporation, vested with a general power to make a contract for the supply of gas or any other commodity, has the right to make it according to its own discretion as to its prudence or good policy, within the limits of its franchise, including the power to make it for more than one year, if by thus contracting it believes that better terms or lower rates can be obtained."

In Ice, Light, & Waterworks Co. v. City of Lake Charles, 106 La. 65, 30 South. 289, it was urged that the city was without authority to make the contract at issue, and the court said:

"A municipality would fail of the purpose intended in its organization if it failed entirely in taking such steps as are necessary to obtain enough water and sufficient light. They are intimately connected with its existence, if the purpose be to provide efficient systems when necessary in administering public affairs. There are decisions by this court and by the courts of sister states recognizing this important right. * * * We are not inclined to curtail a right as *important* and *indispensable* by deciding that express words must be used in order to warrant its exercise." (Italics by the writer.)

In the same case, on page 72 (30 South. 292), Mr. Justice Blanchard, on application for rehearing, had this to say:

"The charter of the town of Lake Charles, adopted in 1867, contained the grant of power to the municipality to construct public works. Under this authority, the town could erect, maintain, and operate a waterworks system requisite for supplying water for flushing streets and gutters, for extinguishing fires, and for all other public purposes, * * * and this carried with it, by necessary implication, the lesser power to contract for supplying the town with water * * * needed for public purposes."

In State v. Kohnke, 109 La. 846, 33 South. 796, it was again said:

"The administration of justice, the preservation of the public peace, and the like, although

confined to local agencies, are essentially matters of public concern; while the enforcement of municipal by-laws, the establishment of gas works, of waterworks, * * * and the like, are matters which pertain to the municipality, as distinguished from the state at large."

In Allen & Currey Mfg. Co. v. Shreveport Waterworks Co., 113 La. 1109, 37 South. 987, 68 L. R. A. 650, 104 Am. St. Rep. 525, 2 Ann. Cas. 471, Mr. Justice Provosty said:

"That this matter of extinguishing of fires is a governmental function is well settled. * * * Of course, the function is not the less governmental if the city, instead of discharging it herself, hires some one else to do it."

[5, 6] So that, at least up to the Constitution of 1921, it was the settled jurisprudence of this state (and jurisprudence is law) that a municipal corporation had the implied power, as one of its incidental administrative and governmental functions, to supervise, regulate, and control the waterworks system and to enter into contracts to supply its inhabitants with water and to fix rates in such contract, and no express grant of power for that purpose was necessary in its charter, and it was common knowledge that all of the municipalities of the state having a waterworks system were exercising the power of supervision, control, and regulation over such waterworks system, and were making contracts and fixing rates therein.

It cannot be assumed that the Constitutional Convention of 1921, composed, as it was, of some of the ablest lawyers and most learned jurists, were unadvised and uninformed as to the jurisprudence referred to and of the exercise by the municipalities of the control, supervision, and regulation and the making of rates by contract when that convention declared that such powers of supervision and control should not be affected by any provisions of the Constitution giving similar powers to the Public Service Commission.

The doctrine held and applied in the cases we have cited was the law of the state at the time of the adoption of the Constitution of 1921, unless the rule of stare decisis has lost its efficacy.

However, conceding that the sounder rule is as stated in Corpus Juris, quoted supra, we find that the power to supervise, regulate, and control the waterworks company and to fix rates was specifically and unmistakably granted to the city of Baton Rouge by its legislative charter, section 20 of which provides:

That "the council shall have power to enact all laws and ordinances necessary, * * * to provide an adequate water supply," and to authorize the use of the street for water pipes and sewers and to regulate the same.

[7] We are unable to see how language could be used which would be more specific and positive and at the same time be more comprehensive and all-embracing. The authority to provide an adequate water supply manifestly includes the power to do and perform everything incident thereto and necessary to attain that object.

The city could not provide an adequate water supply without constructing a water system itself or by contracting with another to do so. And whatever the method adopted by the city to secure a water supply, whether by lease, by contract, or otherwise, the right of the city to control, regulate, and supervise the same followed as a necessary consequence. An adequate water supply could not be secured without the use of the streets for the pipes and sewers, the management, regulation, and control of which was specially delegated to the city. Nor could an adequate water supply be secured without a price, for a price or an adequate or serious consideration is an essential element in every contract, and the fixing of the price follows and is included in the power to supervise, regulate, and control the utility, as we have al-

ready decided in State v. City of New Orleans, supra.

It is argued that the ruling in the above case is no authority in this case for the reason that the municipal government of New Orleans has all the powers and privileges and functions that the Legislature has granted or could grant to any city government. There is not a thing said in the charter of the city of New Orleans concerning the power to make rates any more than there is in the charter of the city of Baton Rouge.

There was no special grant of power even to supervise, regulate, and control the street railway system of New Orleans, let alone a special grant of power to make rates either by contract or mandate. But the right to make rates was very properly held to flow from the general grant as herein above quoted.

There is in point of fact but little difference in the words, and certainly no difference in meaning, of the charter mandate of the city of Baton Rouge and that of the city of New Orleans. In the latter case the state said to the city: You are granted all of the powers and privileges and functions that the state has granted or could grant to any city government. In the former the state said to the city of Baton Rouge: You are granted the power to enact all laws and ordinances that may be necessary to provide an adequate water supply for the city and its inhabitants.

In the case of the city of New Orleans the grant was general, and not special, and in the case of the city of Baton Rouge the grant was special, and not general; but in either case the grant carried with it all the power and authority possessed by the state, and which the state could grant with respect to the subject-matter under consideration.

The state unquestionably enjoyed the prerogative of establishing a waterworks system for the city of Baton Rouge, one of her municipal agencies, and of fixing the rates for such water supply, but instead of exercising that prerogative herself the state commanded the city of Baton Rouge to pass all laws and all ordinances that may be necessary or that may be required to procure for said city an adequate water supply.

In other words, the grant carried with it all of the authority and power which the state could have exercised itself or could have conveyed to the city of Baton Rouge on the subject-matter of procuring a water supply for said city, and this, of course, included the power to make rates for the water secured, unless, in the words of an eminent jurist, "plain English has lost its meaning."

There was plainly no reservation and no restriction in the special grant, and it is not for a moment to be presumed that the state intended to divide the power—to grant all of the powers which the state possessed to the city of Baton Rouge to establish a water system except the power to make rates, and to retain that power in the state.

[8] But it is contended that the authority to provide a water supply and to fix rates by contract does not include the power to establish water rates by compulsion, and that the power to make rates by compulsion must be specifically granted. It is sufficient answer to that contention to say that the fixing of water rates, either by contract or by compulsion, is within the police power of the state, and the granting of the power to fix rates without reservation or restriction carries with it the right to fix rates by either method.

There is not a statute of the state conferring upon a municipality the rate-making power, nor a word made use of in any decision of the Supreme Court of this state, prior to the Constitution of 1921, that distinguishes between the exercise of the police power or rate-making contractually or peremptorily. There is not the least justification for

saying that section 7 of Article 6 of the Constitution intended to grant immunity from the control of the Public Service Commission only those local public service utilities which had theretofore been subject to rates established by the municipality under special mandate authorizing such municipality to make compulsory rates, and to withdraw from all municipalities the supervision, control, and regulation of all of those utilities the rates for the service of which had been made by contract under a general power of regulation, control, and supervision.

What the Constitution said in language so plain "that he who runs may read" is that nothing that is said in conferring on the Public Service Commission the authority to make rates to govern and control local public utilities shall affect the powers of supervision, regulation, and control over those utilities now (then) vested in any town, city, or parish government, etc.

To state it differently, the whole subject-matter is embraced within sections 4 to 7, both inclusive, of article 6 of the Constitution —the power of the Public Service Commission to supervise, regulate, and control the local public utilities and to make rates governing the same—and then, says the organic law, nothing said in this entire article concerning the power of the Public Service Commission to regulate and control local public utilities and to make rates shall in any manner affect, interfere with, supersede, or prejudice the powers of supervision, regulation, and control of those utilities then vested in any town or city, etc.

Surely if it had been the purpose of the Convention to place under the control of the Public Service Commission all local utilities not vested with express power to make rates by compulsion (and this would have included every municipality in the state), the Convention would have readily found language which would clearly and unmistakably have expressed that intention.

The failure to do so is the most convincing proof that the Convention had no such purpose in view. We are unable to agree with the thought, that the Convention, without so expressing in clear and plain terms, concealed within the language used a deliberate purpose to strip all of the municipalities of the state of the supervision, regulation, and control of their waterworks systems, a utility of such vital importance to the welfare, health, and protection from fire of the inhabitants of a municipality, and to place them under the control of the State Commission; and yet that is just what has been done if the contention of the counsel for defendant is adopted.

It cannot be disputed that if the municipalities have no power to make rates they have no power whatever of regulation and control over their waterworks. Under such circumstances the quantity and kind and character of water the citizens are to have will be determined by the Commission, and that Commission will have the power to stop all free water now being supplied to the public schools, orphan asylums, and other public institutions, and require the city of Baton Rouge to pay for same.

It is no answer to say that the Commission will not exercise its power to the extent indicated. Already the Commission has served notice on the waterworks company that it expects to take over absolute and undivided control of all matters relating to supplying the city of Baton Rouge and its inhabitants with water.

Our conclusion is, therefore, that the city of Baton Rouge, at the time of the adoption of the Constitution of 1921, was vested with the power to regulate, supervise, and control the Baton Rouge Waterworks Company, and to make rates to govern the water supplied by the said company, and this power

was not withdrawn nor affected by anything said in the Constitution conferring similar powers on the Public Service Commission, but was expressly reserved to the said city.

This conclusion makes it unnecessary to pass upon the question as to whether or not the waterworks company has such property rights under its contract with the city as cannot be divested or impaired by the state or city. That is not an issue in the case under the views which we have expressed, and it must be understood that we express no opinion on the right of the city to make an inviolable contract. What we have decided, and all that we have decided, is that, as between the Public Service Commission and the city of Baton Rouge, the latter has control, etc., over its waterworks system.

The conclusion herein expressed is not in conflict with the ruling in Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 South. 365. The basis of the decision in that case was the entire absence from the charter of the city of Shreveport of any grant, express or by reasonable implication, of the power of control, supervision, or regulation of the Gas Company, and the absence of any authority to fix the rates and charges for gas supplied to said city and its inhabitants.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is, annulled, reversed, and set aside, and that this case be remanded to the district court to be reinstated on the docket of said court with directions to said court to issue an injunction as prayed for in the petition on the plaintiff giving bond and otherwise complying with the law, and the said cause to be proceeded with according to the views herein expressed and according to law.

OVERTON and LAND, JJ., dissent.

BRUNOT, J., recused.

Rehearing denied by the WHOLE COURT.