164 So.2d 325

**GREATER LIVINGSTON WATER COMPANY**

**v.**

**LOUISIANA PUBLIC SERVICE COMMISSION.**

No. 46937.

May 4, 1964.

Rehearing Denied June 8, 1964.

Joseph H. Kavanaugh, Baton Rouge, for defendant-appellant.

R. Gordon Kean, Jr., Sanders, Miller, Downing, Rubin & Kean, Burton, Roberts & Ward, Baton Rouge, amici curiæ.

J. Douglas Nesom, Nesom & Mellon, Denham Springs, for plaintiff-appellee.

SUMMERS, Justice.

The Greater Livingston Water Company was cited by the Louisiana Public Service Commission to show cause why its rates for water service should not be adjusted. The water company filed an exception to the Commission's order based upon its contention that the Commission had no jurisdiction because the water company " * * * is a utility which is an instrumentality of a political subdivision of the state." This contention was rejected by the Commission, and the water company then sought an injunction in the district court to restrain and prohibit the Commission from assuming jurisdiction. The district court granted this injunction and the Commission has appealed.

The parish of Livingston desired to improve and expand the water service to its inhabitants, but because of debt limitations imposed by law, it was unable to incur the debt required to effectuate this purpose. Accordingly, it provoked the organization of the Greater Livingston Water Company on September 18, 1961, as a Louisiana non-profit, non-stock corporation for the sole purpose of acquiring a water transmission and distribution system in the parish of Livingston. Under the terms of its articles of incorporation: (1) no earnings or assets of the water company inure to the benefit of any private individual; (2) the company's directors conduct its business, are its only members and must be residents of and own property in the parish; they are a self-perpetuating, autonomous board; (3) the police jury is an advisory board of the company and must be notified of, and have the right to attend and participate in, all meetings of the directors; (4) upon payment of all indebtedness the company shall, upon the request of the parish, effect a transfer to the parish of its properties; and (5) upon dissolution all of the company's properties and assets vest in the parish.

One day later, on September 19, 1961, the parish and the company entered into

an agreement called "Indeterminate Agreement". This agreement provided: (a) that the parish had the right pursuant to law to construct a waterworks system; (b) that because of debt limitations the parish was financially unable to construct the system; (c) that the water company had agreed to construct the system at its sole cost and expense and without the use of any funds of the parish; (d) that in order to obtain funds to construct the system the water company would issue its bonds payable solely from the revenue of the system; (e) that the parish had an option to purchase the system on or before 15 years after the date of the bonds at whatever amount was then necessary to retire the bonds in full; (f) that the earnings of the water company must be used by it to pay reasonable and proper operating and maintenance expenses of the system, to pay principal and interest on the bonds, to pay the costs of replacements, additions and extensions to the system and to establish and maintain any reserves required under the terms of the indenture and mortgage securing the bonds; (g) that, after payment of such charges, the water company must pay any excess to the parish, or apply the excess to the prior redemption of its bonds to the end that the parish shall become the operator of the system at the earliest possible time without the use of the parish's funds or taxing powers; (h) that the parish ratified and approved the terms and conditions of the indenture; (i) that the bonds were to be redeemable in 15 years from their date so that the parish could at that time purchase the system if it desired; (j) that the water company was to keep the system in good condition and repair; (k) that the rights of the parish under the agreement were vested rights "in praesenti" as to the title and ownership of the property and constituted an executory contract of title with the right to enforce by specific performance; and (1) that the parish is to take over the system in toto when the bonds are fully paid without any cost or expense to the parish.

The water company then proceeded to obtain the following:

A ruling dated January 3, 1963, signed by the Director of the Tax Ruling Division of the United States Internal Revenue Service to the effect: (a) the bonds would be considered as being issued by or on behalf of the parish and, therefore, interest on the bonds would be excludable from gross income for federal income tax purposes; (b) the water company itself would have no taxable income; and (c) the bonds would be issued in effect by the parish of Livingston and, therefore, would be exempt from any Internal Revenue Stamp Tax, both on the original issue and subsequent transfers.

A ruling by the Louisiana Director of Income and Corporation Franchise Tax

Division stating that the company would be exempt from state income tax and from the corporation franchise tax, and would not be required to file state income or corporation franchise tax returns.

A ruling by the Louisiana Tax Commission that the properties of the company would be exempt from the payment of ad valorem taxes so long as they were owned by the company or the parish.

A ruling by the Attorney General of Louisiana that the company would be exempt from the payment of ad valorem, unemployment insurance, franchise, state income, supervision and inspection, occupational and capital stock taxes.

And, finally, a letter from the Public Service Commission stating that the Commission would take no jursidiction of the water company.

On March 1, 1962, the company executed a mortgage and deed of trust for the security of all bonds it issued, appointing National American Bank of New Orleans as trustee. Under the terms of this agreement, the company established the minimum initial schedule of rates for water and service to be furnished its customers. It agreed that its reserves and other funds would meet certain requirements, before those rates could be reduced. The company further agreed to fix revised rates and charges that would produce the required amounts, if its existing rates and charges did not produce amounts sufficient to maintain the requirements of the mortgage concerning operating expenses and reserves.

Simultaneously, with the execution of the indenture on March 1, 1962, the company executed and delivered in trust to the trustee a deed conveying to the parish all rights, title and interest in and to its property, subject to the indenture, with the stipulation that the deed was to be delivered by the trustee to the parish upon the first to occur of the following events: (1) the payment of all bonds and debts of the company; (2) the parish's exercising its option to purchase the system and paying therefor.

With the proceeds of the bonds thus negotiated, the company proceeded to acquire its water system. To meet its debt and operating requirements the rates of the existing systems it acquired were adjusted upward. Because of complaints of consumers to the Commission and the passage of Act 243 of 1962, LSA–R.S. 45:1205, the Commission issued its order on December 28, 1962, to the company to show cause why its rates should not be adjusted.

The Commission's position, as we understand it, is that its letter to Greater Livingston Water Company wherein it advised that it would take no jurisdiction over the company's operations was based

upon advice from the attorney general's office and legislative enactments it considered controlling at that time, particularly the authority of LSA–R.S. 45:1163 to the effect that:

"The commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities."

and LSA–R.S. 45:1164 which provides that:

"The provisions of * * * R.S. 45:1163 shall not apply to any public utility, the title to which is in the state or any of its political subdivisions or municipalities."

Upon the basis of the foregoing authority the Commission had declined jurisdiction of utilities which it considered to be owned by any political subdivision of the state. However, in 1962 the legislature enacted Act 243 providing that:

"Every public water utility district consisting of all or any part of Livingston Parish presently or hereafter created for any purpose by the governing authority of Livingston Parish shall be under the jurisdiction, supervision, regulation, control and rate fixing authority of the Louisiana Public Service Commission; provided,

however, that no rate or rates fixed by the Public Service Commission shall become effective without the prior approval of the governing authority of the parish of Livingston."

This enactment, the Commission felt, obliged it to assume jurisdiction of the Greater Livingston Water Company and consequently it provoked these proceedings.

■ Our first impression is that Act 243 of 1962 literally applies to water utility "districts" and, therefore, the act is inapplicable to this case because the Greater Livingston Water Company is not organized as a water utility "district", as that term is contemplated in our law. A "district" in legal contemplation is a subdivision of the state, LSA–Const. of 1921, art. 14, § 14(a), and is subject to special legislative limitations, Act 343 of 1926; whereas, the Greater Livingston Water Company is a non-profit corporation operating pursuant to the authority conferred by its charter on its member-board of directors. LSA–R.S. 12:101–12:155.

■ But the issue of the Commission's jurisdiction here cannot be resolved on the basis of a letter from its secretary stating that it did not have jurisdiction, or upon the authority of LSA–R.S. 45:1163 & 45:1164, enacted originally in 1934, or Act 243 of 1962, if this latter enactment were applicable. This is so because there

are constitutional provisions affecting the issue of jurisdiction raised by this controversy, and we must first look to that paramount law. If the obligation to assume jurisdiction is clearly imposed upon the Commission by the constitution, that authority controls until changed by an enactment of equal dignity—a constitutional amendment. Mere legislation can have no effect to alter a mandate of the constitution.

Whatever may have been its position heretofore, the Commission now contends, in the main, that its jurisdiction is bestowed by Article VI, Section 4, of the Louisiana Constitution of 1921 which provides in pertinent part:

"The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all * * * water works * * * and other public utilities in the State of Louisiana, and to fix reasonable and just * * * rates * * * or charges * * * except as herein otherwise provided."

On the other hand, the company relies upon the exception to the foregoing broad and general grant of authority. That exception is contained in Article VI, Section 7, of the constitution and is to the effect that "Nothing in this article (Article VI) shall affect the powers of supervision, regulation and control over any * * * water works, or other local public utility, now vested in any town, city, or parish government * * *" unless or until a majority of the qualified electors should vote to surrender such power.[1]

Prior to the foregoing constitutional enactments in 1921, the rate-making power over privately owned public utilities, other than railroads, etc., under the Railroad Commission, was not delegated by the constitution or the legislature to any state administrative board or commission. Instead, the power to regulate, supervise, control and fix rates was exercised by the various town, city and parish governments under authority contained in their respective charters or other acts of the legislature.

At that time the authority to regulate privately owned public utilities was twofold: The authority to regulate compulsorily and the authority to regulate by contract. To regulate rates compulsorily required a specific grant to the town, city or parish; whereas, the authority to regulate by contract was general in nature and implied from the obligation of

[1]. Another exception appears in Article XIV, Section 14(m) of the Louisiana Constitution of 1921, but it is not at issue here for the company makes no claim that it has qualified for exemption from the Commission regulation under that provision of the constitution, nor does it appear to qualify thereunder.

the town, city or parish government to provide facilities to its inhabitants in order to promote the public health and well-being. Baton Rouge Waterworks Company v. Louisiana Public Service Comm., 156 La. 539, 100 So. 710 (1924); New Orleans Gas Light Co. v. City of New Orleans, 42 La.Ann. 188, 7 So. 559 (1890); Conery v. New Orleans Water Works Co., 41 La.Ann. 910, 7 So. 8 (1889). This latter authority, when exercised, was subject to the higher authority of the state under its police power to compulsorily fix rates and supersede the agreements between the utility and the town, city or parish governments. City of Monroe v. Louisiana Public Service Commission, 233 La. 478, 97 So.2d 56 (1957); McNeely v. Town of Vidalia, 157 La. 338, 102 So. 422 (1924); City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365 (1922); State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922). If not regulated by one of these two methods, privately owned utilities were free to control and supervise their own activities and to fix rates for the services they furnished.

Town, city and parish governments, or other subdivisions of the state, authorized to own and operate utilities in 1921, or by later constitutional amendment, regulated the rates of utilities owned by them through their governing authority. La. Const. of 1921, art. 14, § 14(m); Act 80 of Ex.Sess. of 1921 (LSA–R.S. 33:4161 et seq. & LSA–R.S. 45:1131); Act 248 of 1912; Act 136 of 1898; LSA–R.S. 33:401 (23); Rev.Stat. of 1870, Sec. 2743; City of West Monroe v. Louisiana Public Service Commission, 233 La. 534, 97 So.2d 77 (1957); People's Gas & Fuel Co., Inc. v. Louisiana Public Service Com'n, 177 La. 722, 149 So. 435 (1933); Baton Rouge Water Works Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710 (1924).

■ With this background before them, the framers of the Constitution of 1921 created the Louisiana Public Service Commission and defined its jurisdiction to include the right to fix the rates of all utilities, except insofar as the right to regulate and fix rates may then have been vested in town, city and parish governments. As we have shown, at that time there was vested in some town, city or parish governments the power to regulate and fix the rates of privately owned utilities compulsorily provided that power was specifically conferred by charter or legislative act, and the power to regulate utilities owned by town, city or parish governments was at that time vested in some town, city or parish governments. These constituted exceptions to the Commission's power and jurisdiction and were, in effect, constitutional grants of power to the respective town, city and parish governments preserving the right to govern and the

rights of supervision, regulation and control then vested in those bodies. As such, these constitutional grants are the paramount law of the state and cannot be affected by subsequent legislative acts. For that reason LSA–R.S. 45:1163–45:1164 and Act 243 of 1962, both enacted since 1921, can have no effect which will alter, vary or contradict these constitutional grants.

Thus, the problem confronting us is to be considered first in the light of the exceptions contained in the constitution with special regard to that exception relating to utilities owned by towns, cities or parishes, because the Greater Livingston Water Company relies upon the fact that it is owned by the parish and, by reason thereof, it contends, the parish is authorized to regulate its rates.

If, under the exception contained in Article VI, Section 7, it should be determined that parish governments, generally, or the parish of Livingston, particularly, were vested with authority to own and operate a water works system in 1921, and if the parish does in fact own the Greater Livingston Water Company, then the Public Service Commission has no jurisdiction to regulate the company's rates.

On the other hand, if the company is not owned by the parish, it follows that it is, for rate-making purposes, a privately owned public utility and the Commission has authority to regulate its rates. This would be the case unless it can be established that parish governments, generally, or the parish of Livingston, particularly, had specific authority prior to 1921 to compulsorily regulate water rates of privately owned public utilities within its borders.

Should we find that the parish does not own the utility, we need not determine whether the parish is authorized by law to own such a utility. Therefore at the outset, our approach to this problem will be to answer the company's basic contention and first determine whether the company is owned by the parish. In doing so we pretermit the question of whether the parish was authorized by law to own and operate a water utility in 1921, and confine our consideration to the basic fact of ownership vel non.

Establishing ownership of the utility in the parish cannot be accomplished on the theory that the parish has title to the utility, for by the very terms of the agreements the title to the system which the company owns will not vest in the parish until the first of two certain events occur, either the payment of all bonds and debts of the company or the parish's exercising its option to purchase the system and paying therefor. The facts do not disclose that either of these events have occurred.

To substantiate the conclusion that the parish does not own the system, we observe

that many, if not all, of the indicia of ownership of the system are being exercised by the member-directors of the company. They have granted an indenture of mortgage affecting the system and entered into extensive stipulations with the trustee concerning controls to be exercised in its operation. They have agreed to fix certain rates and to adjust those rates as needed to satisfy the requirements of their bonded indebtedness. They sought no authority—and they needed none—from the police jury of the parish to enter into these agreements. Significantly, the police jury granted a franchise to the company to use the streets, roads and other public places of the parish to install and maintain the water system. This would not have been necessary if the parish owned the system.

It is important to note that, in fixing the rates presently in effect, neither the governing authority of the parish nor the Public Service Commission exercised any authority over the three member-directors of the company. Although it is clear that the police jury was authorized to attend the board meetings in an advisory capacity, we have discerned no authority whereby the advice they may have given, if they did give any and if they did attend the board meetings, could be, or was, imposed upon the board members.

It is true that, according to the terms of the agreements entered into, the member-directors realize no profit from the company's operations, if any are made. Profits realized are credited to the account of the parish with the trustee. This may seem to be somewhat inconsistent with a conclusion that the company owns the system. From another point of view, we notice that the parish has no present responsibility for any of the debts imposed upon the system. This is certainly inconsistent with the claim that the parish owns the system. However, regardless of what the other indicia of ownership may be and what proprietary rights may or may not be vested in the parish, we have observed that the right to fix rates is exercised solely by the member-directors of the company free of any restraint by the governing authority of the parish.

Although the company may be considered for tax purposes to be owned and operated by the parish (and we express no opinion in this regard), it cannot be considered to be owned by the parish for rate-making purposes because the parish does not and cannot control these rates at this time under the agreements which establish the ownership of the water system.

Whatever else the framers of the constitution may have intended, we do not hesitate to conclude that they did not intend that a utility such as that under consideration could be free from the control of either the town, city or parish govern-

ments or the Public Service Commission, and hence subject to no control whatsoever. If the company's contention were to prevail, that would be the situation in this case.

Where a monopoly exists, the regulation by the Public Service Commission, a state agency, of private utility corporations operated for profit has been considered necessary, as it is, for the protection of their customers. The regulation of utilities owned by towns, cities and parishes by the Public Service Commission does not seem to be supported by the same reasoning. The protection of the customers of towns, cities and parishes, who themselves own the system which supplies the water, gas or electricity, lies in their recourse to the ballot. There the rates can be controlled by a selection of the governing authority which imposes them. Georgia Public Service Commission v. City of Albany, 180 Ga. 355, 179 S.E. 369 (1935); 49 Col.L.Rev. 180 (1949).

For a utility's customers to be devoid of the protection afforded by the regulatory power of the Public Service Commission, and to have no recourse through the ballot against the member-directors who are imposing the rates they must pay, would give them no protection against arbitrary and unreasonable exploitation; there would be no assurance of adequate service at reasonable rates. In this case

the company has an exclusive franchise; the member-directors of the company are not elected by the people; they cannot be removed from office by the people, or the parish police jury; they appoint their own successors and are, therefore, immune from any control by the people. Therefore, if they are permitted to avoid regulation by the Commission, their rate-making power would be without any restraint. This is not permitted by Article VI of the Constitution.

■ Having concluded that the company is not owned by the parish insofar as rate-making authority is concerned, it follows that the Commission has jurisdiction unless the parish falls within the other exception to the Commission's jurisdiction contemplated by Article VI, Section 7, of the Constitution, that is, the parish was authorized in 1921 to regulate compulsorily the rates of privately owned utilities operated for profit.

■ The authority of a parish to compulsorily regulate the rates of privately owned public utilities must be expressed by and specifically granted in unmistakable terms. City of Monroe v. Louisiana Pub. Serv. Commission, 233 La. 478, 97 So.2d 56 (1957); Stone v. Police Jury of Calcasieu Parish, 226 La. 943, 77 So.2d 544 (1955); People's Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435 (1933); City of Shreve-

port v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365 (1922).

The provisions of LSA–R.S. 33:1236 which were in effect in 1921 set forth the power and authority of police juries generally. Nowhere therein is the power granted to regulate compulsorily the rates of a water utility system not owned by the parish. The parish of Livingston was created by act of the legislature in 1832, amended by Act No. 95 of 1850; no authority appears in those enactments to permit the parish to regulate compulsorily the rates of a water utility company not owned by the parish. It has been suggested that Act 5 of 1916 (LSA–R.S. 33:4361) grants such authority. A reading of that act readily discloses that the authority granted therein is limited to the right to grant franchises in public roads, alleys or public places for the construction of waterpipes, etc. It does not allude to the authority to regulate rates.

We conclude, therefore, that the parish of Livingston is without authority to regulate the rates of the Greater Livingston Water Company compulsorily. This being so, and having concluded at the outset that the parish does not own the company, it follows there is no exception to the Commission's jurisdiction in this case and the authority to regulate the rates of the company is vested solely in the Commission.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court is reversed, annulled and set aside; that the preliminary injunction issued herein be annulled and set aside; and the Louisiana Public Service Commission is decreed to have jurisdiction and authority to regulate the rates of the Greater Livingston Water Company.

FOURNET, C. J., absent.