97 So.2d 56 (1956)
233 La. 478
CITY OF MONROE
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 42968.
Supreme Court of Louisiana.
June 29, 1956.
On Rehearing January 21, 1957.
Second Rehearing Denied February 25, 1957.
Second Rehearing Granted February 25, 1957.
On Second Rehearing June 10, 1957.
*57 Wood H. Thompson, Haynes L. Harkey, Jr., Monroe, for City of West Monroe, plaintiff-appellant.
Fred S. LeBlanc, Joel B. Dickinson, Jack P. F. Gremillion, Harry Fuller, Baton Rouge, Hargrove, Guyton, Van Hook & Hargrove, Hudson, Potts & Bernstein, Sholars, Gunby & Guthrie, Madison, Madison, Files & Shell, Oliver & Oliver, Monroe, Wilkinson, Lewis & Wilkinson, Shreveport, for Louisiana Public Service Commission, defendant-appellee, and United Gas Corporation, intervenor-appellee.
Ainsworth & Ainsworth, New Orleans, Blanchard, Goldstein, Walker & O'Quin, Shreveport, amici curiae.
Second Rehearing Denied in Nos. 42931 and 42969, February 25, 1957.
Second Rehearing Granted in Nos. 42930 and 42968, February 25, 1957.
SIMON, Justice.
This case presents a controversy between the city of Monroe and the Louisiana Public Service Commission, both having their respective delegated powers under constitutional authority. Inasmuch as it presents a controversy that is identical with that involved in three other appeals[1] pending before this court, all four have been consolidated for purposes of determination here. However, inasmuch as these appeals appear in four different records, bearing four different numbers on our docket, we will render separate decrees in each.
*58 Stripped of all irrelevant and lateral tangibles, the primary question presented in these four appeals is whether the Louisiana Public Service Commission has jurisdiction over the natural gas rates charged by United Gas Corporation in the cities of Monroe and West Monroe, or whether such authority is vested in the respective municipalities.
The record discloses that in 1916 the cities of Monroe and West Monroe entered into separate commutative contracts, each granting franchises for the use of its streets for the transportation, distribution and sale of natural or manufactured gas for said city and its inhabitants for a period of 30 years. During the life of these contracts or franchises, the rights therein were assigned to United Gas Corporation and expired by limitation in 1946.
On April 22, 1947, an election was held in Monroe for the purpose of determining whether its Commission Council should adopt an ordinance granting to United Gas Corporation a gas franchise for a period of 25 years. Subsequent to the favorable vote of the electorate, on April 28, 1947, the Commission Council of the city of Monroe adopted an ordinance granting a gas franchise to said corporation for a period of 25 years and fixing therein specified chargeable service rates. In compliance with the provisions of said ordinance, United Gas Corporation, on May 12, 1947, formally accepted the said franchise; and from the effective date of this ordinance and its acceptance the United Gas Corporation continued to use the streets of the city of Monroe and to receive the benefits under said ordinance without any attempt to effect a change in said rates until this present controversy arose. A similar contract or franchise, with certain exceptions not relevant to the issue here involved, was entered into between United Gas Corporation and the city of West Monroe.
On July 1, 1955, United Gas Corporation applied to the Louisiana Public Service Commission to have the rates at which it was distributing and selling natural and manufactured gas increased so as to yield in additional revenue a net rate of 6½% upon its invested capital, not only in the cities of Monroe and West Monroe, but in the entire "Monroe Division", embracing 16 cities and towns located in 8 parishes in North Louisiana, as well as rural services in 7 additional parishes. The cities of Monroe and West Monroe being embraced within the "Monroe Division" were formally cited and notified of the said application. These two cities appeared and challenged the jurisdiction of the Commission on the ground that the power to fix rates at which gas could be sold within their respective municipal limits had been conferred upon them by their respective charters and by Article 6, Section 7 of the Louisiana Constitution of 1921, LSA, by which provision, insofar as the said cities were affected, such jurisdiction was withheld from and was not vested in the Louisiana Public Service Commission. The Commission overruled said exception and rendered an order holding that jurisdiction over public utilities was conferred upon it by the Legislature and that it would proceed to exercise such rate-making power as authorized by Act 19 of 1934, 2nd Ex.Sess., and by LSA-R.S. 45:1163-1164. Whereupon, these present proceedings were filed for injunctive relief against said Commission.
Temporary restraining orders were issued, and by rules nisi the said Commission was ordered to show cause why a preliminary injunction should not be granted and why its order overruling the cities' plea to its jurisdiction should not be annulled and the application of the United Gas Corporation dismissed. Though neither a defendant nor a party to either of these suits, United Gas Corporation filed in each suit what was designated as a petition of intervention alleging that it would thereafter file an answer as intervenor to the petition of the cities, which it did on the following day. Exceptions of no cause and no right of action and motions to dismiss were filed thereto by the cities on the ground that United *59 Gas Corporation was illegally attempting to substitute itself as a party-defendant and that the lower court was without right or authority to confer such status upon it. These exceptions and motion were overruled; and plaintiffs reurge them before us. We shall pretermit the resolution of this procedural question in view of the conclusions reached by us on the merits of the controversy.
Defendant, Louisiana Public Service Commission, and the United Gas Corporation filed similar answers to plaintiffs' petitions; and the cities, reserving all rights under their exceptions and motions, filed answers to the said so-called intervention. After trial, judgments were rendered vacating and setting aside the temporary restraining order, recalling the rules nisi theretofore issued and denying the preliminary injunctions sought by plaintiffs, from which judgments appeals were applied for and granted.[2]
Thereafter the cities filed pleas of unconstitutionality directed at Acts 6 and 19 of the Second Extra Session of the Legislature of 1934, and at LSA-R.S. 45:1163-1164, together with pleas of estoppel, and sought permanent injunctions against the Commission. Upon trial on the merits, judgments were rendered denying the permanent injunctions as well as other relief sought and holding that the Louisiana Public Service Commission had full and exclusive jurisdiction over the rates charged for natural or manufactured gas by the United Gas Corporation in the cities of Monroe and West Monroe. Appeals from said judgments were applied for and granted.[3]
Unquestionably the rate-making power, whether exercised by agreement or by the fiat of law, is one of the highest attributes of sovereignty and is inherent in the state as an element of her police power, and which under our constitutional inhibition can never be abridged or irrevocably surrendered. Section 18, Article 19 of the Louisiana Constitution of 1921. However, it is a well-recognized principle that the state may, either expressly or by reasonable implication, delegate to a municipal corporation or to some subordinate commission the lawful exercise of its police power within the corporate limits of such municipality or designated boundaries of such commission.
The Louisiana Public Service Commission was created by Section 3 of Article 6 of the Constitution of 1921 and vested with authority to fix rates for local and statewide public utilities. The Commission was the successor of what was then known as the Railroad Commission of Louisiana whose power had been confined to common carriers, including the fixing of passenger and freight tariffs and service, express rates and telephone and telegraph charges. Article 284 of the Constitution of 1898 and 1913. The power of the new Commission was extended so as to vest it with authority to supervise, regulate and control public utilities, specifically state railways, gas electric light, heat, power and waterworks local as well as state-wideand to fix reasonable and just rates, fares, tolls, or charges for the services rendered by such public utilities. However, this extended power is significantly qualified by the words "except as herein otherwise provided". Section 4, Article 6, Constitution of 1921.
The proviso or exception alluded to is to be found in Section 7, Article 6, and clearly declares that "Nothing in this article shall affect the powers of supervision, regulation, and control over any * * * waterworks, or other local public utility, now vested in any town, city, or parish government"; that said power shall not be vested in or exercised by the Public Service Commission, unless or until a majority of the qualified electors of such town, city or *60 parish, voting thereon, shall vote to surrender such powers. (Italics ours.)
In the instant case, no election has been held in or by the cities of Monroe or West Monroe for the purpose of surrendering such powers.
Manifestly, if the municipal governments of said cities had the authority to fix the rates, fares, tolls, and charges of local public utilities, immediately before the Constitution of 1921 was adopted, and if the language of the reservation contained in Section 7 of Article 6 is comprehensive and specific enough to include the power to fix rates, then the municipal councils of the respective cities herein involved have that exclusive power now.
Section 7 of Article 6 makes no specific reference to the power to make rates and charges. However, when its language is taken in connection with that of Section 4, we are of the opinion that by the reservation of "the powers of supervision, regulation and control" it was the intention and purpose of the framers of the Constitution to except and to exclude from the Public Service Commission the power to make rates to govern those local public service utilities which theretofore had been placed by law under the power, supervision and control of the town, city, or parish government.
In other words, the clear intent and purpose of Section 7, unless plain English has lost its meaning, was to reserve to all municipalities that already had such powers all of the powers that would otherwise have been taken from them and conferred upon the Commission by the provisions of Section 4. It could not have been intended to allow the municipalities to retain control, supervision and regulation of their public utilities, and to withhold from them the power to make rates and to place that authority in the Public Service Commission. In the case of State v. City of New Orleans, 151 La. 24, 91 So. 533, 537, we placed this construction on the qualifying section or proviso of Section 4 of Article 6, wherein we said:
"* * * But our opinion is that the reservation of `the powers of supervision, regulation and control' was intended to include, and does include, the authority to fix rates. * * *"
Quoting further from said case, particularly in reference to the language contained in Section 6 of Article 6, in regard to local utilities which may thereafter be placed under the control of the Commission, we said:
"* * * The language is a recognition that there are public utilities * * * that are not `under the control of the commission;' and it is an acknowledgment that those public utilities that are not `under the control of the commission' are not subject to the authority of the commission to fix rates, * * *
"We do not find any indication in the provisions of the new Constitution referring to public utilities * * * of an intention to divide the authority over local public utilitiesto give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making authority, over a local public utility. There is no reason why such authority should ever beand an obvious reason why it should never beso divided; for a division of it would only result in confusion, conflict of authority, and deadlocks."
We are cognizant of the fact that the conclusions reached in the New Orleans case, supra, were concurred in by the entire court of nine justices, as then constituted, two of whom, namely, Justices Dawkins and Overton, having served as members of the constitutional convention of 1921, were undoubtedly aware of the purposes of the framers of the Constitution in the adoption of Article 6 and particularly the sections thereof bearing on the case at bar.
*61 We must, therefore, examine the charters of the cities of Monroe and West Monroe to ascertain whether each possessed the authority to supervise, regulate and control the fixing of rates, tolls, or charges for services rendered to themselves and to their respective inhabitants by public utilities, particularly rates for natural or manufactured gas.
The city of Monroe was chartered by Act No. 47 of 1900, which was subsequently amended by Act No. 35 of 1904 and Act No. 130 of 1906. The 1906 amendment remained in force at the time the Constitution of 1921 was adopted. This charter, as amended, conferred upon said city full power and authority to adopt all ordinances necessary to promote the general welfare of the city and its inhabitants; to exercise general police powers; to grant franchises for valuable consideration, with full authority to use its streets and alleys for the laying of water and gas pipes and to regulate the same; to provide an adequate water supply; to erect, purchase, maintain and operate waterworks and electric light and gas plants, and to regulate the same and to prescribe rates at which water, gas and electric lights shall be supplied to its inhabitants.
Thus we see that the city of Monroe, by its charter, as amended, was vested with all the powers, rights and immunities incident to the functioning and life of a municipal corporation; that its Municipal Council enjoys full authority to adopt ordinances necessary for the general welfare of its inhabitants and the exercise of its general police powers in the attainment of proper government. To this end the Municipal Council of the city of Monroe was specially empowered and became vested with authority to grant franchises, as it did in 1916 and again under ordinance adopted April 28, 1947, for the use of its streets in the laying of gas lines and for the transportation, distribution and sale of gas, and to regulate the same, to prescribe rates therefor and to exercise all general police powers in connection therewith.
We have on several other occasions defined the extent of the powers enjoyed by various municipalities by virtue of their municipal charters.
In the early case of Conery v. New Orleans Water-Works Co., 41 La.Ann. 910, 7 So. 8, 12, the authority of the city of New Orleans to enter into a contract for the supply of water to the corporation was challenged as being ultra vires, illegal and unconstitutional in that the contract allegedly exceeded the limitations placed upon her in the exercise of her police powers. In resolving the issue presented by said challenge, we said:
"The city of New Orleans by virtue of her inherent police powers, then, had a right to contract with reference to a water supply for the public health, and to extinguish fires. And, having the right, and having made the contract, her responsibility is to be measured like that of an individual or any civil or business corporation."
"* * * Her charter is silent as to any restriction. In it there is no regulation of any price as to the water to be supplied, nor is there any restriction as to the quantity or the character of the water. * * * And in the instant case the city of New Orleans had full power to contract, without restraint as to price, quantity or kind of water, and we are not disposed to question the administrative discretion vested in the city in this respect. * * * We are of the opinion that, independent of any statutory provision subsequently enacted authorizing the city to contract for her water supply, that she had full and plenary power to do so under the provisions of her charter."
In New Orleans Gas-Light Co. v. City of New Orleans, 42 La.Ann. 188, 7 So. 559, 560, the power of the city to enter into a certain contract with the Louisiana Electric Light & Power Company was challenged; and we said:
"The rule as established by jurisprudence seems to be that, in the absence of special *62 legislative prohibition or restriction, a municipal corporation, vested with a general power to make a contract for the supply of gas, or for any other commodity has the right to make it according to its own discretion as to its prudence or good policy, within the limits of its franchise, including the power to make it for more than one year, if by thus contracting it believes that better terms or lower rates can be obtained."
In Lake Charles Ice, Light & Water-Works Co. v. City of Lake Charles, 106 La. 65, 30 So. 289, 291, the authority of the city to make the contract at issue was questioned, and we said:
"* * * A municipality would fail of the purpose intended in its organization if it failed entirely in taking such steps as are necessary to obtain enough water and sufficient light. They are intimately connected with its existence, if the purpose be to provide efficient systems when necessary in administering public affairs. There are decisions by this court and by the courts of sister states recognizing this important right of municipalities. We are not inclined to curtail a right as important and indispensable by deciding that express words must be used in order to warrant its exercise. * * *"
In the same case, on application for rehearing, we said:
"The charter of the town of Lake Charles, adopted in 1867, contained the grant of power to the municipality to construct public works. Under this authority, the town could erect, maintain, and operate a waterworks system requisite for supplying water for flushing streets and gutters, for extinguishing fires, and for all other public purposes, * * * and this carried with it, by necessary implication, the lesser power to contract for supplying the town with water * * * needed for public purposes."
In State ex rel. Saunders v. Kohnke, 109 La. 838, 33 So. 793, 796, we again said:
"* * * The administration of justice, the preservation of the public peace, and the like, although confined to local agencies, are essentially matters of public concern; while the enforcement of municipal by-laws, the establishment of gasworks, of waterworks, * * * and the like, are matters which pertain to the municipality, as distinguished from the state at large."
In Allen & Currey Mfg. Co. v. Shreveport Waterworks Co., 113 La. 1091, 37 So. 980, 987, 68 L.R.A. 650, 104 Am.St.Rep. 525, 2 Ann.Cas. 471, Mr. Justice Provosty said:
"* * * That this matter of extinguishing of fires is a governmental function is well settled. * * * Of course, the function is not the less governmental if the city, instead of discharging it herself, hires some one else to do it; * * *"
Thus we see, at least up until the Constitution of 1921, the settled law of this state, which had the efficacy of stare decisis, was that a municipality enjoyed as an incident of its administrative and governmental functions the implied powers of the supervision, regulation and control over waterworks systems and the power to enter into contracts and fix rates therein for the supply of water to its inhabitants. No express grant of power for that purpose was necessary in its charter, for at that time it was common knowledge that all municipalities of the state having waterworks systems, in the exercise of their supervision, control and regulation thereof, were making contracts therefor and fixing rates therein. Therefore, we are fully at liberty to assume that the framers of the Constitution of 1921, being composed of some of our ablest and most learned lawyers and jurists, were fully advised and informed of the jurisprudence of our state and of the fact that municipalities had been and were exercising control, supervision and regulation over public utilities and making rates therefor by contract. Apprised as they were of these facts, it is our opinion that they intended and did declare that such powers of supervision *63 and control vested in the municipalities should not be affected by any of the provisions of the Constitution giving similar powers to the Public Service Commission.
As seen from the provisions of the charter of the city of Monroe, as amended, and as above described, the Legislature conferred upon that city the power and authority not only to own and operate gas and electric light plants, but the power and authority to prescribe rates at which water, gas and electric lights should be supplied to its inhabitants by a public or municipally owned plant, or by privately owned utility plants selling to the inhabitants of the city. Even if the power to supervise, regulate and control such public utilities and the fixing of rates in connection therewith could be held to be not expressly conferred by its charter, then such power as a natural consequence flowed from the expressed authority conferred upon the municipality to grant franchises for the use, control and regulation of its streets and alleys and to fix the terms and conditions under which they could be used and the consideration to be paid therefor. An adequate and economical supply of gas to its inhabitants cannot be secured without the use of its streets and alleys for the laying of pipes and sewers, the management, regulation and control of which was and is specially delegated to said city. Consideration being an essential element in every contract, it necessarily follows that the fixing of the price or rates is included in the power to supervise, regulate and control the utility. State v. City of New Orleans, supra; Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710, 714.
The contention that the authority to fix rates by contract does not include the power to do so by compulsion unless it be specifically granted is dispelled by the principle that the fixing of rates for utility services, either by contract or by compulsion, is within the police power of the state; and when such police power is delegated without reservation or restriction, as was done in the instant case, the delegated power carries with it the right to fix rates by either method. In the Baton Rouge Waterworks Co. case, supra, we made the following observation:
"There is not a statute of the state conferring upon a municipality the rate-making power, nor a word made use of in any decision of the Supreme Court of this state, prior to the Constitution of 1921, that distinguishes between the exercise of the police power or rate-making contractually or peremptorily. There is not the least justification for saying that section 7 of Article 6 of the Constitution intended to grant immunity from the control of the Public Service Commission only those local public service utilities which had theretofore been subject to rates established by the municipality under special mandate authorizing such municipality to make compulsory rates, and to withdraw from all municipalities the supervision, control, and regulation of all of those utilities the rates for the service of which had been made by contract under a general power of regulation, control, and supervision.
"What the Constitution said in language so plain `that he who runs may read' is that nothing that is said in conferring on the Public Service Commission the authority to make rates to govern and control local public utilities shall affect the powers of supervision, regulation, and control over those utilities now (then) vested in any town, city, or parish government, etc.
"To state it differently, the whole subject-matter is embraced within sections 4 to 7, both inclusive, of article 6 of the Constitution the power of the Public Service Commission to supervise, regulate, and control the local public utilities and to make rates governing the sameand then, says the organic law, nothing said in this entire article concerning the power of the Public Service Commission to regulate and control local public utilities and to make rates shall in any manner affect, interfere with, *64 supersede, or prejudice the powers of supervision, regulation, and control of those utilities then vested in any town or city, etc.
"Surely if it had been the purpose of the Convention to place under the control of the Public Service Commission all local utilities not vested with express power to make rates by compulsion (and this would have included every municipality in the state), the Convention would have readily found language which would clearly and unmistakably have expressed that intention.
"The failure to do so is the most convincing proof that the Convention had no such purpose in view. We are unable to agree with the thought, that the Convention, without so expressing in clear and plain terms, concealed within the language used a deliberate purpose to strip all of the municipalities of the state of the supervision, regulation, and control of their waterworks systems, a utility of such vital importance to the welfare, health, and protection from fire of the inhabitants of a municipality, and to place them under the control of the State Commission; and yet that is just what has been done if the contention of the counsel for defendant is adopted."
The views we have expressed in relation to the delegated powers and vested rights in favor of the city of Monroe are equally and as forcibly applicable to the city of West Monroe.
The city of West Monroe was chartered under Act No. 49 of 1882, which was subsequently amended under Section 43 of Act 136 of 1898 (Lawrason Act) in 1899. The 1899 Act, as amended, remained and was in force at the time the Constitution of 1921 was adopted. Section 5 of said Act which was in effect at the time the Constitution of 1921 was adopted is as follows:
"To grant to any person or corporation the use of the streets, alleys and public grounds for the purpose of laying gas, water, sewer, or steam pipes, or conduits for electric light, to be used in furnishing or supplying the town and inhabitants or any person or corporation with gas, water, sewerage, steam or hot air for heating purposes, or light, but no such franchise, or right of way, or privilege of any character whatsoever shall be exclusive nor shall the same be granted for a longer period than 25 years."
By the clear language of the quoted paragraph the Legislature conferred upon the city of West Monroe full power and authority to grant to any person or corporation the use of its streets, alleys and public grounds for the purpose of laying gas, water, sewerage, or steam pipes to be used in furnishing or supplying the town and its inhabitants with gas, water, sewerage, steam or hot air for heating purposes, with the limitation that such grant shall not be exclusive and for a duration not to exceed 25 years.
The West Monroe charter, as amended, further provides in Section 8 that the municipality should exercise full and complete jurisdiction in relation to its streets, sidewalks and sewerage.
From these express powers delegated under Sections 5 and 8 flowed as one of its incidental administrative and governmental functions the implied power to supervise, regulate and control the distribution, transportation and sale of gas through the use of its streets; to enter into contracts and fix the conditions under which these gas mains and lines should be laid; to fix the terms and conditions under which gas should be supplied to its inhabitants and to the city itself; and to fix rates at which gas should be furnished and supplied to the city and its inhabitants.
Our conclusion is, therefore, that the cities of Monroe and West Monroe at the time of the adoption of the Constitution of 1921 were vested with the powers to regulate, supervise and control utility-rendering services to their respective inhabitants and to make rates to govern the transportation, distribution and sale of natural or manufactured gas, within their respective *65 corporate limits, and that these powers were not withdrawn nor affected by any provision in the Constitution of 1921 conferring similar powers on the Louisiana Public Service Commission, but were expressly reserved to and vested in said cities.
Counsel for appellees quote extensively from the case of City of Shreveport v. Southwestern Gas & Electric Co., 1922, 151 La. 864, 92 So. 365, and submit and rely thereon for support of their contention that by Article 19, Section 18 of the Constitution of 1921 the police power of the state can never be abridged by franchises or contracts granted or entered into by municipal corporations, and, further, that utility rates are always subject to review by the state, through the Public Service Commission, under Section 4 of Article 6 of the Constitution. This contention is without merit, for the reason, as expressed by us in the Baton Rouge Waterworks case, that the basis of the decision in City of Shreveport v. Southwestern Gas & Electric Co., supra was the entire absence from the charter of the city of Shreveport of any grant, express or by reasonable implication, of the power of control, supervision, or regulation of the Gas Company, and the absence of any authority to fix the rates and charges for gas supplied to said city and its inhabitants. Whereas, as above stated, the cities of Monroe and West Monroe had been granted, expressly or by reasonable implications, such powers by legislative authority.
Counsel for appellees further contend that assuming arguendo that rate-making powers were delegated to the cities of Monroe and West Monroe in their respective legislative charters so that the power to compulsorily fix gas rates within their respective corporate limits was retained on adoption of the Constitution of 1921, pursuant to the provisions of Section 7, Article 6, such powers were especially revoked and repealed by Acts 6 and 19 of the Second Extra Session of 1934 and were, therefore, non-existent when the franchises of 1947 were granted by said cities.
Said Act No. 6 states:
"Section 1. Be it enacted by the Legislature of Louisiana, That any and all laws and parts of laws granting authority and power to the municipalities of this State to supervise, regulate and control the rates charged and to be charged by, and service of, any street railway, gas, electric light, heat, power, waterworks or other local public utility, be and the same are, hereby revoked and repealed."
Said Act No. 19 states:
"Section 1. Be it enacted by the Legislature of Louisiana, That hereafter the Louisiana Public Service Commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished or to be furnished by such public utilities.
"Provided that this act shall not apply to any public utility the title to which is in the State of Louisiana or any of its political subdivisions or municipalities."
The said Act 19 was expressly repealed when the Louisiana Revised Statutes of 1950 were adopted. However, its content became the source of LSA-R.S. 45:1163-1164.
"The commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities." LSA-R.S. 45:1163.
"The power, authority, and duties of the commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by such public utilities.
"The provisions of this Section and R.S. 45:1163 shall not apply to any public utility, *66 the title to which is in the state or any of its political subdivisions or municipalities." LSA-R.S. 45:1164.
A mere reference to the language contained in LSA-R.S. 45:1163 and 1164 will readily show that the Legislature intended to grant no greater rights to the Commission than those theretofore granted. And, further, said sections are but in effect a reiteration of the powers granted to said Commission under Section 4 of Article 6 of the Constitution.
Generally speaking, the Louisiana Revised Statutes of 1950 were legally enacted as the general law of the state. It will be observed that LSA-R.S. 33:4491 to 4496 provided for the surrender by towns, cities or parishes of powers to regulate municipal and parish utilities, thereby recognizing the continuance in full force and effect of the powers which had been previously conferred upon municipalities. See, also, LSA-R.S. 33:552 relative to the adoption of ordinances authorizing the granting of any franchise or right to occupy or use the streets in municipalities. Manifestly, the Legislature would not have enacted these sections which preserve to the municipalities which were exercising such powers of supervision, regulation and control their right to surrender such powers when and if a majority of the electorate authorized same at an election to be held for that specific purpose.
If the Legislature had intended by the adoption of LSA-R.S. 45:1163 and 1164 to withdraw from municipalities such powers it would have clearly stated so and would not have done a useless and void thing by enacting LSA-R.S. 33:4491-4496.
Again, if such had been the intention of the Legislature, it would not have conferred upon the municipalities the right and authority to make all contracts and to do all other acts in relation to its property and necessary for the exercising of its corporate and administrative powers (LSA-R.S. 33:361); it would not have granted the right to the municipalities to use their streets for the laying of gas mains to be used for supplying the inhabitants of the municipalities with gas for a period not to exceed 25 years (LSA-R.S. 33:401, subsection (12); it would not have conferred upon two or more municipalities the right to engage jointly in the exercise of any power which each of the participating authorities may exercise or undertake individually under any provision of general or special law, including, but not limited to, activity concerning public utility services such as water, light, gas and transportation. LSA-R.S. 33:1324.
It is our opinion that LSA-R.S. 45:1163-1164 apply to all local public utilities except those utilities municipally owned and except to those municipalities which were exercising the power and authority to supervise, regulate and control the utilities within their limits, as constitutionally recognized in Section 7 of Article 6 of the Constitution, and which right and authority had not been surrendered to the Commission, in accordance with law.
Whatever power the Legislature may exercise over the municipalities, it is crystal clear that it cannot take from them or their inhabitants the power, right or authority vested in them by the Constitution of the state. No citation of authority is needed to support the principle that the Legislature cannot repeal the provisions of the Constitution by general laws. Thus, the contention of counsel for appellees that Act 6 of the Second Extra Session of 1934, a general law, revoked and repealed powers granted by the Constitution to municipalities and their inhabitants is without merit.
It will be observed that the said Act 6 repealed all laws granting authority and power to municipalities of the state to supervise, regulate and control the rates charged or to be charged for and service of, any street railway, gas, electric light, or other local public utility. However, the *67 said Act 6 was omitted from the LSA-Revised Statutes of 1950 and, at first blush, such omission would suggest its repeal, the Revised Statutes being regularly enacted as the general law of the state and to thus prevail until expressly amended or repealed; and to resort to omitted or repealed statutes would only serve as a means of contradicting or confusing the provisions now contained in our general statutory law.
Nevertheless, this Act never could have applied to cities such as Monroe and West Monroe, which were vested with and exercising by constitutional authority the very powers that said Act purported to repeal and revoke, for the obvious reason that a legislative act cannot repeal a provision of the Constitution. Furthermore, the Act, having purported to take from municipalities those powers which had been vested in and reserved to them by Section 7 of Article 6 of our Constitution, conflicted with said section, rendering the said Act clearly unconstitutional.
It is, therefore, our conclusion that LSA-R.S. 45:1163 and 1164 do not vest jurisdiction in the Public Service Commission over the fixing of rates at which natural or manufactured gas can be transported, distributed and sold within the cities of Monroe and West Monroe.
The question involving the inviolability of the contracts and franchises entered into between the cities of Monroe and West Monroe and the United Gas Corporation is not an issue in this case, and we express no opinion as to its validity or legality. Our decision herein is that as between the Public Service Commission and the cities of Monroe and West Monroe the Louisiana Public Service Commission has no jurisdiction over the rate-making power for the distribution and sale of manufactured or natural gas within the corporate limits of the latter municipalities.
Accordingly, for the reasons assigned, the judgment of the district court is reversed, annulled and set aside.
It Is Now Ordered, Adjudged and Decreed that the Louisiana Public Service Commission be, and the same is hereby permanently restrained and enjoined from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation in Docket No. 6873 of said Commission for the revision of gas rates within the city of Monroe.

On Rehearing of Nos. 42930, 42968, 42969 and 42931.
PONDER, Justice.
We granted a rehearing in this case to review our ruling enjoining the Louisiana Public Service Commission from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation for the revision of gas rates within the City of Monroe and the City of West Monroe.
It was pointed out in the application for rehearing that this court in its original opinion did not cite nor discuss the cases of Gulf Public Service Company v. Louisiana Public Service Commission, 177 La. 911, 149 So. 517 (hereinafter referred to as the Winnfield case) and People's Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435 (hereinafter referred to as the Ruston case), which two cases it is contended cannot be reconciled with the holding in the original opinion handed down by this court.
The question posed for consideration is whether the police power of the state, insofar as concerns the fixing of local utility rates, has been entrusted by the people and the Legislature to the towns and municipalities or to the Louisiana Public Service Commission.
It is the contention of the Louisiana Public Service Commission that neither the City of Monroe nor the City of West Monroe had in 1921 been entrusted with the rate-fixing power of the state. While the Cities of Monroe and West Monroe contend *68 that they were expressly given rate-fixing powers under the Lawrason Act, Act 136 of 1898 and their charters and that this right was recognized and preserved in the Constitution of 1921.
The City of Monroe operated under the authority of special legislative charter granted by Act No. 47 of 1900, as amended by Acts Nos. 35 of 1904 and 130 of 1906. The powers of the municipality are enumerated in Section 9, Act No. 35 of 1904 in paragraph 7.
The City of West Monroe operates under the Lawrason Act, as amended and its powers as to privately owned utilities operating in the city differ in no material respect from the powers granted by Subsection Thirty-one of Section 9 of the Act of 1904.
The Louisiana Public Service Commission created by Section 3 of Article 6 of the Constitution of 1921 LSA was given authority to fix rates for local and state-wide public utilities. This authority is qualified by the words "except as herein otherwise provided."
Under Section 4 of Article 6 of the Constitution, "The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all * * * gas, electric light, heat and power, * * * and other public utilities in the State of Louisiana and to fix reasonable and just single and joint line, rates, fares, tolls or charges for the commodities furnished, or services rendered by such common carriers or public utilities, except as herein otherwise provided."
Section 7 of Article 6 of the Constitution sets out that
"Nothing in this article shall affect the powers of supervision and control over any street railway, gas, electric light, heat, power, water works, or other local public utility, now vested in any town, city or parish government unless and until at an election to be held pursuant to laws to be hereafter passed by the Legislature, a majority of the qualified electors of such town, city, or parish, voting thereon, shall vote to surrender such powers. In the event of such surrender such powers shall immediately vest in the Louisiana Public Service Commission; provided, that where any town, city, or parish shall have surrendered as above provided, any of its powers of supervision, regulation and control respecting public utilities, it may in the same manner, by a like vote, re-invest itself with such powers."
It is to be noted that Section 4 of Article 6 speaks of rate-fixing powers whereas Section 7 of Article 6 makes no mention of rate-fixing powers but refers only to the powers of supervision and control. A mere reading of these articles of the Constitution shows that supervision and control are treated separately from rate-fixing power, and that the supervision and control vested in the cities was not to be affected, but no such provision is made as to the rate-fixing power.
It is argued by the City of Monroe that Section 7 is a grant of immunity from legislative change to the municipalities. While the Commission urges that Act 6 of 1934, 2nd Ex.Sess., and Act 19 of 1934, 2nd Ex.Sess., LSA-R.S. 45:1163, 45:1164, delegated such rate-fixing powers to the Public Service Commission.
It is to be observed that the grant of power of these two cities under the Lawrason Act and their charters is the same as was granted the Town of Ruston in People's Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435. Therein it was said that the power to establish rates for a plant owned by the municipality is quite different from the power to fix rates compulsorily for gas to be furnished by a privately owned corporation and the court held that the Lawrason Act and the charter did not grant the latter power. This case is identical *69 with the one under consideration and it was therein held that the municipality had not the right to fix rates compulsorily for the furnishing of gas by a privately owned company but that such power is vested in the Louisiana Public Service Commission.
In the case of Gulf Public Service Co. v. Louisiana Public Service Commission, 177 La. 911, 149 So. 517, this court reviewed the jurisprudence and held that unless the power of rate-fixing is expressly given to municipalities, they do not have such power. In that case the cases of State v. City of New Orleans, 151 La. 24, 91 So. 533; Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710 and McNeely v. Town of Vidalia, 157 La. 338, 102 So. 422 were discussed and distinguished. In the City of New Orleans case it was pointed out that the state by the charter of the city and the acts amendatory thereof, had delegated to New Orleans all the power that state could lawfully grant to it. The City of Baton Rouge under its charter was vested with authority at the time of the adoption of the Constitution of 1921 to establish rates and charges and such powers was therefore withheld from the Public Service Commission. The Town of Vidalia had been reserved the right to fix rates governing ferries under a legislative delegation of power. The court further pointed out that in the case of City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365 where the defendant company furnished gas to the City of Shreveport under an agreement entered into with the city that the question for determination was not whether the city had heretofore the power to fix a gas rate by agreement with the gas company but whether the city had the power to impose a gas rate by compulsion. The court found that the delegation of power was given to the city by the Lawrason Act to fix gas rates by agreement and held that the power to fix rates by compulsion was not so given.
The charter of the City of West Monroe (Act No. 49 of 1882, subsequently amended under Section 43 of Act 136 of 1898, known as the Lawrason Act) reads thus: "To grant to any person or corporation the use of the streets, alley and public grounds for the purpose of laying gas, water, sewer, or steam pipes, or conduits for electric light, to be used in furnishing or supplying the town and inhabitants or any person or corporation with gas, water, sewerage, steam or hot air for heating purposes, or light, but no such franchise, or right of way, or privilege of any character whatsoever shall be exclusive nor shall the same be granted for a longer period than 25 years."
The City of Monroe was chartered by Act No. 47 of 1900, which was subsequently amended by Act No. 35 of 1904 and Act No. 130 of 1906. Under this charter the city was authorized to exercise general police powers; to grant franchises; to provide an adequate water supply; to erect, purchase, maintain and operate waterworks and electric light and gas plants, and to regulate the same and to prescribe rates at which water, gas and electric lights shall be supplied to its inhabitants.
Thus it will be seen that the two cities herein were given the power to fix rates by agreement but they were not given the power to fix rates compulsorily, this power being in the Public Service Commission.
For the reasons assigned, the judgments of the lower court are affirmed. The right to apply for a rehearing is reserved to City of Monroe and City of West Monroe.
SIMON, J., dissents, adhering to the views expressed in the original opinion rendered June 29, 1956.

On Second Rehearing of Nos. 42930 and 42968
FOURNET, Chief Justice.
This case is now before us on second rehearing, limited, however, to a consideration of the correctness of our views on *70 first rehearing with reference to the City of Monroe.[1] Our original opinion, 233 La. 478, 97 So.2d 56, delineated the manner in which the proceedings arose and set out the contentions variously advanced; it suffices now to summarize briefly that the United Gas Corporation, a privately owned public utilitywhich, on May 12, 1947, had formally accepted a gas franchise granted by ordinance of the Commission Council of the City of Monroe pursuant to authority from the electorate, the term being 25 years and specified rates being therein fixedon July 1, 1955, applied to the Louisiana Public Service Commission to have the gas rates increased so as to provide a net yield of 6½% upon its invested capital; the Commission having overruled a challenge to its jurisdiction founded on the City's claim that the power to fix rates at which gas could be sold within the municipal limits of Monroe had been conferred by the City's charter and had never vested in the Louisiana Public Service Commission, these proceedings were filed for injunctive relief against the Commission; and from a judgment denying the permanent injunction and holding that the Commission had full and exclusive jurisdiction over the rates charged for gas by the United Gas Corporation in the City of Monroe, the City appealed.
When the case was first before us the Court, following the jurisprudence of this State holding that those municipalities vested at the time of the adoption of the Constitution of 1921 with the power to compulsorily fix rates for local public utilities were not affected by the general powers of the Louisiana Public Service Commission to supervise, govern, regulate and control public utilities in this State, and finding as a fact that the City of Monroe, under the powers granted it by the Legislature, was given authority not only to grant franchises for the use of its streets in the laying of gas lines for the transportation, distribution and sale of gas and to regulate the same, but also to compulsorily fix and prescribe rates at which the gas should be sold, reversed the judgment of the lower court and adjudged the Louisiana Public Service Commission enjoined from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation for the revision of gas rates within the city of Monroe.
In a reconsideration of this case on first rehearing the Court reversed its ruling, first observing, "It is to be noted that Section 4 of Article 6 speaks of rate-fixing powers whereas Section 7 of Article 6 makes no mention of rate-fixing powers but refers only to the powers of supervision and control. A mere reading of these articles of the Constitution shows that supervision and control are treated separately from rate-fixing power, and that the supervision and control vested in the cities was not to be affected, but no such provision is made as to the rate-fixing power," [233 La. 514, 97 So.2d 68], and concluded that while the City of Monroe under its charter[2] was given the power to fix gas rates by agreement, it had not the power to do so compulsorily and therefore the opinion in the Town of Ruston case was controlling (People's Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435). The judgment of the lower court was therefore affirmed.
Upon the showing made on application for a second rehearing by the City of Monroe that the Court by its interpretation *71 (contained in the observation quoted above) gave an import to Sections 4 and 7 of Article 6 of the Constitution[3] which was irreconcilable with previous adjudications on the same subject matterthe Court having on at least two occasions[4] held that the authority to supervise, regulate and control local public utilities included the authority to fix rates, and that as to cities having such regulatory power at the time of the adoption of the Constitution of 1921, the Louisiana Public Service Commission was without rate-making authoritythis second rehearing was granted.
While we have felt bound, as to cities operating under the Lawrason Act (e.g., City of West Monroe), by jurisprudence of this Court interpreting the rate-making powers over privately-owned utilities granted in that Act,[5] no such consideration obtains in the case of the City of Monroe, which operates under a special charter; and upon further careful study and analysis of cases interpreting the provisions of special charters with respect to the power to fix rates, in the light of Section 7, Article 6 of the Louisiana Constitution of 1921 declaring that nothing in the Article shall affect the powers of supervision, regulation and control over any local public utility then vested in a town or city, we are impressed not only with the soundness of the views expressed in the New Orleans and Baton Rouge cases[6] but also with the significance of those views in the light of their timely utterance, since the constitutional provisions pertinent here had then been recently *72 framed and adopted;[7] and have concluded that with respect to the special charter of the City of Monroe, our first solution as so the powers there granted was correct.
By original charter the Monroe city council (composed of a Mayor and nine councilmen) was granted power "To provide an adequate water supply, and to erect, purchase, maintain and operate waterworks and electric light plants, and to regulate the same; and prescribe rates at which water and gas and electric lights shall be supplied to the inhabitants." This language is so clear that interpretation is unnecessary, and unless the amendments and reenactments of the section are restrictive of the power granted (as contended by counsel for the United Gas Corporation, which filed a petition of intervention and an answer in the lower court), the City still possessed it when the Constitution of 1921 was adopted.[8] A perusal of the charter's amendments and reenactments pertinent to this case clearly shows that, rather than restricting the powers originally granted, the intention of the Legislature was to enlarge the authority of the council, since not only were the original powers retained unchanged in each enactment, but new powers were added.[9]
The contention that the authority to establish rates by compulsion must be specifically granted has been considered by this Court and disposed of in the concise holding that "It is sufficient answer * * * to say that the fixing of * * * rates, either by contract or by compulsion, is within the police power of the state, and the granting of the power to fix rates without reservation or restriction carries with it the right to fix rates by either method." Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 552, 100 So. 710, 714.
The next contention of counsel for the Public Service Commission is that *73 whatever, if any, regulatory rate-making power Monroe ever had over a private gas utility company was repealed and taken away by Act 6 of the Second Extra Session of 1934; and that by Act 19 of that same session, the power to fix and regulate rates charged and service furnished by certain local public utilities, including gas, was placed in the Louisiana Public Service Commission. This contention is without merit.
In granting a second rehearing in this case it was our intention to limit it to the errors hereinabove mentioned; but having failed to so provide, we have re-examined the two acts of the Legislature above mentionedbearing in mind the action taken by the Legislature of 1950 when, in adopting the Revised Statutes, it incorporated not only the provisions of Act 19 of the Second Extra Session of 1934 (R.S. 45:1163 and 1164) but also those of Act 116 of the Extra Session of 1921 which, following the mandate contained in Section 7 of Article 6 of the Constitution that laws be passed by the Legislature covering the subject, prescribed the procedure to be followed by a municipality desiring to surrender its powers of supervision, regulation and control to the Public Service Commission or to reinvest itself with such powers (R.S. 33:4491 et seq.); and taking note of the correlation between those sections of the Revised Statutes and the various pertinent provisions of Article 6 of the Constitution, all of which matters were ably analyzed in our original opinion, after further careful analysis and study we have concluded that we were correct in our initial pronouncements and that no useful purpose would be gained by reiterating them here.
For the reasons assigned, the judgment of the district court is annulled and set aside and our original decree is reinstated; accordingly, it is now ordered, adjudged and decreed that the Louisiana Public Service Commission be, and the same is hereby permanently restrained and enjoined from entertaining jurisdiction of or from holding a hearing on the application of United Gas Corporation in Docket No. 6873 of said Commission for the revision of gas rates within the City of Monroe.
PONDER, HAMITER, and HAWTHORNE, JJ., dissent with written reasons.
PONDER, Justice (dissenting).
I cannot agree with the majority opinion because I believe that Act 47 of 1900, as amended and re-enacted by Act 35 of 1904 and Act 130 of 1906 (repealing all laws in conflict therewith) only granted to the City of Monroe the right to erect and operate a gas and light plant and to fix the rates to be charged for that service and does not grant them the power to fix compulsory rates on privately owned public utilities.
I can see no material difference between these acts and the Lawrason Act. This Court in two cases held that the city did not under the Lawrason Act have the power to compulsorily fix rates. People's Gas & Fuel Co. v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435 and Gulf Public Service Company v. Louisiana Public Service Commission, 177 La. 911, 149 So. 517.
The grants of power to a city beyond those necessary for its properly functioning as a municipality are construed strictly and any reasonable doubt is resolved against the corporation. As was pointed out in City of Shreveport v. Southwestern Gas and Electric Company, 151 La. 864, 870, 92 So. 365, 367:
"Indeed, this power compulsorily to impose rates being a high attribute of sovereignty, not particularly needed by municipalities for properly functioning, and not usually delegated to them, its delegation could not well be held to have resulted unless from such terms *74 as were positive or absolutely unmistakable."
It is my opinion that these acts (Act 47 of 1900, as amended and re-enacted by Act 35 of 1904, and Act 130 of 1906) do not in unmistakable language grant such powers to the City of Monroe.
I respectfully dissent.
HAMITER, Justice (dissenting).
In City of Shreveport v. Southwestern Gas and Electric Company, 151 La. 864, 92 So. 365, 367 the following was said: "In reading the city charter for ascertaining whether it confers this power we are to bear in mind that grants of power to a city beyond those necessary for its properly functioning as a municipality are construed strictly, and that any reasonable doubt is resolved against the corporation. * * *
"Indeed, this power compulsorily to impose rates being a high attribute of sovereignty, not particularly needed by municipalities for properly functioning, and not usually delegated to them, its delegation could not well be held to have resulted unless from such terms as were positive or absolutely unmistakable." See also People's Gas and Fuel Company, Inc., v. Louisiana Public Service Commission, 177 La. 722, 149 So. 435. In the light of this principle it is clearly improper to hold, in my opinion, that the charter of the City of Monroe (Act 47 of 1900, as amended and re-enacted by Acts 35 of 1904 and 130 of 1906) grants the power compulsorily to fix rates; for therein no delegation to that effect is set forth in "positive or absolutely unmistakable" terms.
In fact, a reading of the pertinent charter provisions without applying the doctrine of the Southwestern Gas and Electric Company case convinces me that the ratemaking right given thereby to the City of Monroe relates solely to the operation of municipally owned plants. Incidentally, a like conclusion was reached by this court in People's Gas and Fuel Company, Inc., v. Louisiana Public Service Commission, supra, when construing substantially similar provisions contained in the charter of the City of Ruston.
I respectfully dissent.
HAWTHORNE, Justice (dissenting).
I regret that I cannot agree with the majority holding in this case. However, I think it is legally unsound, and therefore I must dissent.
Article 6, Section 7, of the 1921 Constitution provides:
"Nothing in this article shall affect the powers of supervision, regulation, and control over any street railway, gas, electric light, heat, power, water works, or other local public utility, now vested in any town, city, or parish government * * *."
I agree with the majority of the court that the issue in this case is whether the charter of the City of Monroe vested in that city the power to compulsorily fix rates for privately owned companies at the time the 1921 Constitution was adopted, but in resolving this question the majority has done violence to established Louisiana jurisprudence.
In City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365, 367, we had to decide whether the City of Shreveport had the authority in 1921, under its city charter, to impose a gas rate by compulsion. In its opinion in the Shreveport case this court noted that grants of power to a city beyond those necessary for its proper functioning as a municipality are strictly construed, that any reasonable doubt is resolved against the corporation, and stated:
"Indeed, this power compulsorily to impose rates being a high attribute of sovereignty, not particularly needed by municipalities for properly functioning, and not usually delegated to them, its delegation could not well be held to have resulted *75 unless from such terms as were positive or absolutely unmistakable." (Italics mine.)
Eleven years later this rule of strict construction was approved by this court in People's Gas & Fuel Co. v. Louisiana Public Service Comm., 177 La. 722, 149 So. 435, 436, in these words:
"* * * it is necessary to determine in disposing of this appeal whether or not the town of Ruston, at the time of the adoption of the Constitution of 1921, had power to establish rates for the furnishing of gas by public utilities, not by agreement, but by compulsion. For the town of Ruston to have the power to fix such rates, it must appear that the power was granted to the town in unmistakable terms." (Italics mine.)
The above rule of strict construction has never been abandoned or even questioned by this court.
In the instant case the Monroe city charter in 1921 pertinently provided as follows:
"Seventh. To provide an adequate water supply and to erect, purchase, maintain and operate water works and electric and gas light plant, and to regulate the same, and to prescribe rates at which water and gas and electric lights shall be supplied to the inhabitants * * *."[1]
The section of the Monroe city charter quoted above is susceptible of at least two different interpretations with regard to gas rates, i.e.:
1. The City of Monroe has the power to prescribe the rates at which gas shall be supplied to the inhabitants by municipally owned plants.

Or
2. The City of Monroe has the power to prescribe the rates at which gas shall be supplied to the inhabitants by all plants, whether municipally or privately owned.
Because that part of the Monroe city charter which deals with the city's power to prescribe gas rates is vague and susceptible of at least two widely different interpretations, it follows that Monroe was not granted the power to compulsorily fix such rates for privately owned companies in terms that are "positive" and "unmistakable", and as under our jurisprudence any reasonable doubt must be resolved against the power, I conclude that the City of Monroe does not have the authority to compulsorily fix gas rates for privately owned companies, but that this power is vested in the Louisiana Public Service Commission.
NOTES
[1] No. 42,930, entitled City of Monroe v. Louisiana Public Service Commission, 233 La. 533, 97 So.2d 76; and Nos. 42.931 and 42,969, entitled City of West Monroe v. Louisiana Public Service Commission, 233 La. 534, 535, 97 So.2d 77, 78.
[2] These appeals involve Transcripts Nos. 42,930 and 42,931.
[3] These appeals involve Transcripts Nos. 42,968 and 42,969.
[1] As explained in our original opinion, the City of Monroe and the City of West Monroe instituted separate proceedings challenging the jurisdiction of the Louisiana Public Service Commission, upon application of the United Gas Corporation, to fix gas rates within their respective municipalities; appeals by the cities from adverse judgments of the lower court were consolidated here for purposes of determination of the issue. The application of the City of West Monroe for a second rehearing was denied.
[2] Act 47 of 1900, as amended and reenacted by Act No. 35 of 1904 and Act No. 130 of 1906.
[3] Section 4: "The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all * * * gas * * * and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates, * * * for the commodities furnished, or services rendered by such * * * public utilities, except as herein otherwise provided. * * *." Section 7: "Nothing in this article shall affect the powers of supervision, regulation and control over any * * * gas * * * or other local public utility, now vested in any town, city * * * government unless and until at an election to be held pursuant to laws to be hereafter passed by the Legislature, a majority of the qualified electors of such town, city * * * voting thereon, shall vote to surrender such powers. In the event of such surrender such powers shall immediately vest in the Louisiana Public Service Commission; provided, that where any town, city * * shall have surrendered as above provided, any of its powers of supervision, regulation and control respecting public utilities, it may in the same manner, by a like vote, re-invest itself with such powers." (Article 6, Louisiana Constitution of 1921).
[4] In State v. City of New Orleans, 151 La. 24, 91 So. 533, this Court, in an exhaustive and well-considered opinion, said: "* * * It is true section 7, in terms, reserves only `the powers of supervision, regulation and control over any street railway, * * * or other local public utility.' It does not specify the authority to fix rates. But our opinion is that the reservation of `the powers of supervision, regulation and control' was intended to include, and does include, the authority to fix rates. * *" (151 La. at pages 33-34, 91 So. at page 537) "We do not find any indication in the provisions of the new Constitution referring to public utilities (sections 3 to 9, inclusive, of article 6) of an intention to divide the authority over local public utilitiesto give to a municipality the supervision, regulation and control, and give to the Louisiana Public Service Commission the rate-making authority, over a local public utility. There is no reason why such authority should ever beand an obvious reason why it should never beso divided; for a division of it would only result in confusion, conflict of authority, and deadlocks." 151 La. at pages 35-36, 91 So. at page 537. That holding was affirmed in the case of Baton Rouge Waterworks Co. v. Louisiana Pub. Serv. Comm., 156 La. 539, 100 So. 710.
[5] See People's Gas & Fuel Co. v. Louisiana Public Service Comm., 177 La. 722, 149 So. 435, and Gulf Public Service Co. v. Louisiana Public Service Commission, 177 La. 911, 149 So. 517.
[6] State v. City of New Orleans, 151 La. 24, 91 So. 533; Baton Rouge Waterworks Co. v. Louisiana Public Service Comm., 156 La. 539, 100 So. 710.
[7] As pointed out in our original opinion, "We are cognizant of the fact that the conclusions reached in the New Orleans case, supra [State v. City of New Orleans, 151 La. 24, 91 So. 533), were concurred in by the entire court of nine justices, as then constituted, two of whom, namely, Justices Dawkins and Overton, having served as members of the constitutional convention of 1921, were undoubtedly aware of the purposes of the framers of the Constitution in the adoption of Article 6 and particularly the sections thereof bearing on the case at bar."
[8] The Louisiana Constitution of 1921, in creating the Louisiana Public Service Commission (Article 6, Section 3) and vesting it with authority to "supervise, govern, regulate and control * * * gas * * * and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates * * * for the commodities furnished, or services rendered by such * * * public utilities, * * *" (Article 6, Section 4), declared that "Nothing in this article [Article 6] shall affect the powers of supervision, regulation and control over any * * * gas * * * or other local public utility, now vested in any town, * * *" unless or until a majority of the qualified electors shall vote to surrender such powers; and in the same manner, by a like vote, the city may reinvest itself with powers previously surrendered (Article 6, Section 7).
[9] Paragraph 7, Section 9 of the original charter, Act 47 of 1900, as amended and reenacted by Act 35 of 1904, is shown below, the 1904 amendment being indicated by italics: "SeventhTo provide an adequate water supply and to erect, purchase, maintain and operate water works and electric and gas light plants, and to regulate the same, and prescribe rates at which water and gas and electric lights shall be supplied to the inhabitants and, also, to construct, own, operate and maintain within and without the city, and within or without the Parish of Ouachita, electric street railways and to supply electric power to private individuals or corporations for any purpose." In 1906, by Act 130 of the Legislature of that year, there were added, after the words "electric street railways," the following: "and to carry thereon freight and passengers;" and at the end, following the word "purpose," were added the words "and to fix the charges therefor."
[1] Section 2 of Act No. 130 of 1906, amending and reeneacting the seventh paragraph of Section 9 of Act No. 35 of 1904, which in turn amended and reenacted, among other things, Section 9 of Act No. 47 of 1900.